## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LUIS ANTONIO AGUILAR MARQUINEZ<br>DANIEL SERRANO CHITO<br>FEDERICO SALINAS JIMENEZ<br>JACINTO MARTINEZ IBARRA<br>GUZMAN CASTRO EPIFANO<br>LUIS ALBERTO PESANTEZ REDROVAN<br>HERIS GEOVANNY MALLA LOPEZ<br><br>     **Plaintiffs,**<br>**vs.**<br><br>DOLE FOOD COMPANY, INC.;<br>DOLE FRESH FRUIT COMPANY;<br>STANDARD FRUIT COMPANY;<br>STANDARD FRUIT AND STEAMSHIP<br>COMPANY;<br>THE DOW CHEMICAL COMPANY;<br>OCCIDENTAL CHEMICAL<br>CORPORATION (individually and as<br>successor to Occidental Chemical Company<br>and Occidental Chemical Agricultural<br>Products, Inc., Hooker Chemical and Plastics,<br>Occidental Chemical Company of Texas and<br>Best Fertilizer Company);<br>AMVAC CHEMICAL CORPORATION;<br>SHELL OIL COMPANY;<br>CHIQUITA BRANDS INTERNATIONAL,<br>INC; CHIQUITA BRANDS, L.L.C. as<br>successor in interest to Maritrop Trading<br>Corporation; CHIQUITA FRESH NORTH<br>AMERICA, L.L.C. (individually and as<br>successor in interest to United Fruit Sales<br>Corporation and Chiquita Brands, Inc.); DEL<br>MONTE FRESH PRODUCE, N.A., INC.,<br><br>     **Defendants.** | **CIVIL ACTION NO.:**<br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs named above and in the body of this Complaint file this Original Complaint and allege as follows:

## I.   PRELIMINARY STATEMENT

1.     Plaintiffs file this Original Complaint for personal injuries sustained as a result of exposure to 1, 2, dibromo 3, chloropropane, commonly known as DBCP and referred to hereafter as "DBCP".

## II.   JURISDICTION and VENUE

2.     This Court has jurisdiction to hear the claims in this Complaint based on diversity of citizenship between Plaintiffs and Defendants and because each Plaintiff's damages exceed $75,000.00 exclusive of interest and costs.

3.     The Plaintiffs are foreign nationals from Costa Rica, Panama, or Ecuador.  The Defendants are United States corporations.

4.     Certain of the Defendants maintain facilities in the District of Delaware and conduct business in the District.  Defendants Shell Oil Company, Dow Chemical Company, Dole Foods Company, Inc., Standard Fruit Company and Standard Fruit and Steamship Company are incorporated in Delaware and were when the acts and/or omissions and/or other operative facts occurred that gave rise to the Plaintiffs' causes of action set forth below.

## III.   BACKGROUND

5.     Workers on banana-growing plantations in Costa Rica, Ecuador, and Panama, among other countries, injected 1, 2, dibromo 3, chloropropane  "DBCP" into the soil or sprayed DBCP over the fields to protect against microscopic worms called nematodes that dwell in cultivated soils.  The laborers wore no gloves, protective covering, or respiratory equipment to prevent skin absorption or inhalation of DBCP because no Defendant ever informed them that

they were in danger and because no Defendant provided protective clothing or equipment to these workers, some of whom are Plaintiffs in this case.

6.      Moreover, the fumes and vapors from DBCP released during the application of the chemical exposed everyone in the vicinity. Unknown to the workers as well as bystanders in the vicinity of the fumes and vapors, each breath they took after workers mixed DBCP or injected it into the ground or sprayed it over the banana fields became a health hazard.  The fumes and vapors released by the chemical remained trapped under the canopy created by the large impermeable banana leaves which cut off almost all ventilation and drifted throughout the banana plantation exposing anyone working in the vicinity.   The banana leaves formed a virtually impermeable ceiling in the fields that trapped humidity, moisture, and the fumes and vapors from DBCP in the breathing zones of all those present under the banana leaf canopy (think of fish steamed in a banana leaf – the banana leaf's impermeable character traps the steam and moisture that cooks the fish).

7.      In addition to inhaling the fumes and vapors released from the handling and application of DBCP, workers who handled DBCP sustained exposure through their skin when DBCP splashed on them in the course of filling their canisters, or when their injectors hit rocks or other objects causing the injection of DBCP to spray into the air and onto their person.  Many workers absorbed so much DBCP each day that their urine would give off the smell of the chemical at night.

### A.      Effects - Sterility

8.      Among other adverse health effects, the affected Plaintiffs suffer from various degrees of sterility.  Their bodies produce little or no sperm and the sperm that is produced is often deformed and/or inactive.  Men whose testes produce no sperm are termed azoospermic;

men who produce fewer sperm than normal are oligospermic.  Even a man with a normal sperm count level may have slow moving, deformed, or stunted sperm as a result of DBCP exposure that compromises his reproductive capacity and renders him effectively infertile.

### B.    Effects – Cancer

9.    The United States Environmental Protection Agency ("EPA") lists DBCP as a probable human carcinogen and has done so since at least 1976.  The National Cancer Institute ("NCI") lists DBCP as one of the most potent known carcinogens.  NCI tests have demonstrated that DBCP induces cancer in a wide range of organs and sites, generally at the lowest dose tested and as a result is regarded as a multi-site carcinogen which means it is capable of causing cancer in multiple locations and organs in the human body.

### C.    Effects - Other Health Hazards

10.    DBCP has been linked to a variety of birth defects and is a suspected cause of miscarriages in women who have sustained repeated exposures.  Women working on plantations who sustained exposure to DBCP or who attempted to conceive with a man who had been exposed to DBCP have reported several consecutive miscarriages.  Medical and scientific research has revealed that in addition to causing sterility, DBCP can cause damage to the cornea in exposed persons and can compromise a person's renal system, respiration system, can cause chronic skin disorders, as well as testicular atrophy, impotence, headaches, and chronic stomach ailments.

### D.    Effects – Environmental Harm

11.    Environmentally, DBCP is regarded as a highly persistent and mobile pesticide. DBCP decomposes slowly in soil. Studies show that DBCP remains in soils for years and is able to migrate through certain soils to groundwater. DBCP is chemically stable in water, even in

very small amounts, and persists in water for years.  DBCP has also been reported as a low-level air contaminant.  DBCP has been widely found as a contaminant in ground and surface water in California, Hawaii, and elsewhere in the United States and abroad.  In California and Hawaii, municipalities have recovered hundreds of millions of dollars from The Dow Chemical Company, Shell Oil Company, Occidental Chemical Corporation, and AMVAC Chemical Corporation, the principal manufacturers of DBCP, for the costs related to remediation of DBCP-contaminated water supplies.

E.      **Testing for Hazards – Dow and Shell's Early Discoveries**

12.     What little pre-market toxicology research that was done on DBCP was conducted in or around 1958 by Dow's company doctor, Dr. Ted Torkelson, and by Shell's consultant, Dr. Charles Hine of the University of California Medical School in San Francisco.  In testing DBCP on rats, both labs found that DBCP caused retarded growth, organ damage, shrunken testes, and sterility. In an April 1958 "confidential report," Dr. Hine, working for Defendant Shell, wrote that ***"among the rats that died, the gross lesions were especially prominent in lungs, kidneys, and testes.  Testes were usually extremely atrophied."*** Emphasis added. Dow's first in-house report came three months later, in July 1958, and concluded that DBCP was ***"readily absorbed through the skin and high in toxicity in inhalation."*** Dow's data also showed that ***"liver, lung and kidney effects might be expected"*** and that ***"testicular atrophy may result from prolonged, repeated exposure. "*** Emphasis added.

13.     When scientists working for Dow informed corporate decision makers of evidence that DBCP caused a series of health problems, Dow intentionally played down the health risks and resisted warning about DBCP's dangers because of the negative effect Dow believed it would have on sales of DBCP.   DBCP was actually entered in the toxicology card

file in Dow's medical library.  The toxicology card for Dow's flagship product, Fumazone, initially noted eye and skin effects, and stated that testicular damage "*may result from chronic exposure to active material*." Emphasis added.  Liver and kidney damage were also discussed, but the toxicology cards were soon altered to delete information on testicular damage.  Dr. Torkelson, Dow's consultant, would later opine that, "*the cards addressed singular exposures, and you don't see testicular changes on single exposures.  It was put on some of the cards because whoever wrote it knew about it and thought it was important enough to put it on there along with liver and kidney effects.  When it was retested, the testes didn't show an affect from a single exposure, and a new card was made out.*" Emphasis added.

**F.    USDA Registration and Product Labeling**

14.    In May 1961, Dr. Hine, who was now working jointly for Dow and Shell, drafted a report in support of USDA registration of DBCP.  Dr. Hine's draft report called for work place concentrations of DBCP to be kept under one part per million ("ppm") and recommended the use of impermeable protective clothing if skin contact with DBCP was likely.  Louis Lykken, who was in charge of government registration of chemicals for Shell, dismissed the suggestion as "*impractical*." Emphasis added.  After concluding DBCP related animal studies, Hine made the observation that repeated exposure could affect human reproduction, which was contained in the draft report to the USDA.  Lykken's response:  "*Leave out speculation about possible harmful conditions to man.  This is not a treatise on safe use.*" Emphasis added

15.    In 1961, Shell officials discussed how to dilute the strength of precautionary statements that Shell expected governmental regulatory authorities to require. The following are excerpts from Shell's internal memoranda:

August 21, 1961:

"We have discussed with Dr. Zavon USDA's precautionary labeling and the hazards associated with this pesticide chemical. He shares our opinion that USDA is being over cautious in their views on labeling products containing this pesticide chemical. It is the consensus that Dr. Zavon and a representative of Dow's toxicology group should meet with the USDA toxicology section representatives to settle this issue."

August 29, 1961:

"We have just received and reviewed the subject Technical Bulletin [and information brochure on Nemagon (Shell's flagship product)] and *have some reservations with regard to the adequacy of the statements under safety precautions.* In light of the fact that the threshold of odor detection has been reported at one point at seven parts per million and the lowest level studied [five parts per million] has demonstrated damage after repeated exposures, *it appears the statement "there is a good margin of safety in handling" would be difficult to justify and might be prosecuted as negligent."*

Emphasis added.

And then two months later, in November 9, 1961 Shell officials made the following observations:

"The pesticides regulations branch of the U. S. Department of Agriculture has expressed concern over the hazards associated with the use of Nemagon soil fumigant and proposed stringent labeling for the various formulations now being marketed. It is the consensus in the division office that the USDA is being overly cautious and *the precautionary statements proposed could have an adverse effect on the sale of this product."*

Emphasis added.

### G.     Central American Banana Plantation Trials

16.     Despite early and clear indications of adverse health effects, DBCP trials nevertheless began on the Standard Fruit Company's Central American banana plantations in approximately 1965. William Liebhard, who would go on to become a professor of agriculture at the University of California-Davis, but at the time was a young scientist with Standard Fruit in Honduras, recalled early DBCP trials:

In the DBCP trials, toxicological analyses were not undertaken on the potential effects of those chemicals on user's health or in the environment. . . . We did not consider such factors at all at that time frame.

17.     The Standard Fruit Company (now a subsidiary and the alter ego of Dole) maintained its corporate headquarters in New Orleans. The United Fruit Company (now Chiquita) also maintained corporate offices in New Orleans.  Both of these two multi-national banana growing concerns engaged with one or more of the Manufacturing Defendants—The Dow Chemical Company, Shell Oil Company, Occidental Chemical Company, and the AMVAC Chemical Corporation—to procure DBCP and distribute DBCP to their banana growing operations in Costa Rica, Panama, and Ecuador.

18.     Throughout the banana plantations in Latin America owned, operated or otherwise controlled by Dole, Del Monte, and Chiquita, warehouse workers and mixers, field applicators, irrigation tower workers, and field hands had regular, heavy exposure to DBCP through vapor inhalation and skin absorption.  In addition, workers in the vicinity of the application process as well as children visiting their parents in the fields to deliver coffee or meals sustained substantial toxic exposure to DBCP that would have permanent effects.

19.      None of the banana plantation production manuals contained warnings of the damaging testicular effects of DBCP or the adverse health effects from exposure and did not advise of the need to use safety gear or provide reasons for persons in the zone of exposure to take precautions.  The labels on the DBCP containers certainly did not alert anyone, and field workers invariably state that no warnings of the product's dangers were ever given.

20.     In fact, six months after the EPA suspended use of DBCP in the United States because of the adverse health effects from exposure, a March 3, 1978 memorandum regarding DBCP safe handling procedures authored by Dr. Jack Dement, the director of worldwide pest control efforts for the Dole predecessor Castle & Cooke, Inc. actually directed Dole plantation managers to ignore certain proposed guidelines for DBCP use.  For example, Dr. Dement

directed his farm managers to ignore a guideline "not [to] apply DBCP unless the treated area was a safe distance away from worker housing and work areas or unless all people had been evacuated from those surrounding areas. "Referring to this guideline, Dr. Dement wrote, "***This is not operationally feasible and does not need to be implemented***." Dr. Dement's memorandum went on to indicate that, "***only personnel working at the DBCP pump, rather than applicators, should be provided respiratory devices for the protection against DBCP vapors***." Emphasis added.

### H.  Banning and Exportation

21.     By 1976, the EPA had identified DBCP as a suspected carcinogen. In July 1977, thirty-five of one hundred fourteen workers who manufactured DBCP at Occidental's Lathrop, California plant were found to be sterile. Approximately one month later, in September 1977, the EPA suspended DBCP from all but a few highly controlled uses in Hawaii, and only under heavily restricted conditions with extensive protective equipment. Finally, in 1979 the EPA canceled the registration for DBCP for all uses in the United States, exempting Hawaii pineapple until 1985 when the EPA canceled the registration for pineapple as well. By then the large-scale use of DBCP on agricultural operations in the United States had already led to extensive groundwater contamination in Hawaii, California, and elsewhere. Even though the EPA prohibited most uses of DBCP, there were still large stocks on hand and Dow, Occidental, AMVAC, Shell, Dole, and Del Monte decided not to let it go to waste.

22.     The ban on manufacturing and using DBCP in the United States did not stop the Defendants from exporting existing stocks of DBCP for use on pineapple and banana plantations overseas, and some workers have reported using DBCP until at least 1985. In 1977, when Dow informed Standard Fruit (now Dole) that it planned to halt sales of DBCP, Standard Fruit

responded by threatening legal action: "***Your halt of shipping our outstanding orders is viewed as a breach of contract***." Emphasis added. Dow relented once Standard Fruit agreed to indemnify Dow against claims for injuries resulting from DBCP use. This offers compelling evidence that both Dow and Dole anticipated such injuries would occur and nevertheless continued to sell and use DBCP with a conscious disregard for the consequences.

23.     AMVAC perceived a market opportunity and deliberately entered the Latin American market to supply multi-national banana growers, including the Dole Defendants, after the United States EPA severely limited the permissible uses for DBCP in 1977.     AMVAC described this business strategy in documents filed with the U.S. Securities and Exchange Commission in 1978:

> [AMVAC] Management believes that because of the extensive publicity and notoriety that has arisen over the sterility of workers and the suspected mutagenic (alterations in living cells) and carcinogenic nature of DBCP, the principal manufacturers and distributors of this product (Dow, Occidental and Shell) have temporarily, at least, decided to remove themselves from the domestic marketplace and possibly from the world marketplace….Notwithstanding all the publicity and notoriety surrounding DBCP it was [AMVAC] Chemical's opinion that a vacuum existed in the marketplace that [AMVAC] Chemical could temporarily occupy providing [AMVAC] Chemical met all the requirements imposed by a variety of governmental bodies at  various levels.

> *   *   *   *   *

> Beginning early January 1978, [AMVAC] Chemical began receiving a limited quantity of DBCP from a Mexican manufacturer.  Subsequently a second foreign manufacturer also began supplying small quantities of product….The combined sales of DBCP along with other manufactured products continues to sustain [AMVAC] Chemical's operations…An additional problem confronting [AMVAC] Chemical is product liability exposure.

See AMVAC Form 10k for the fiscal year ended December 31, 1977.

24.     In fact, Occidental and Shell did not exit the international market after all. Occidental continued to sell DBCP in 1978 for use on banana plantations in the Plaintiffs'

countries, and a unit of Shell sold DBCP to Dole as late as 1981 for use on its banana plantations in Africa.

25.     The controversy over DBCP use abroad after the EPA suspended its use even became the focus of hearings in the United States Senate:

> [I]ndustry studies. . . were kept secret from domestic chemical company employees and from agricultural workers using DBCP in the field.  Now, tragically, twenty years later, the sterilization that had been predicted by laboratory tests became a reality - increasing numbers of workers in the manufacturing plants and banana fields found they could not have children.  EPA finally banned DBCP from nearly all domestic farm uses, but the companies then dumped their unused stocks overseas where it continued to be used.  As a result, more banana workers in Costa Rica were sterilized.  The tale of DBCP is an appalling one.

Senator J. Leahy, Circle of Poison:  Impact of U. S. Pesticides on Third World Workers, Hearings before the Committee on Agriculture, Nutrition, and Forestry, 102 Cong., First Sess. 1 (June 5, 1991).

26.     Once available stocks of DBCP began to be exhausted, Castle and Cooke, Inc.(now Dole) entered into negotiations with Dow to arrange to set up a DBCP plant to be run by Castle & Cooke, Inc. (now Dole) outside the United States.  Dole also entered into contracts to procure stocks of DBCP from both Occidental Chemical and AMVAC Chemical Corporation at least as late as 1978 even though the U.S had already suspended DBCP use.  Thus, despite all the known hazards of DBCP and despite the extensive damage already done to those who had sustained exposure to DBCP, Castle & Cooke (now Dole) continued to look for a way to circumvent the ban on production of DBCP in the United States so it could continue to use it in the developing countries where it operated around the world.

## IV.   **PARTIES**

### A.   **Defendants**

27.    In accordance with FRCP 10(c), Plaintiffs incorporate by reference section III. Background as if fully set forth herein as well as all other previous paragraphs where applicable.

28.    Defendants The Dow Chemical Company, Shell Oil Company, Occidental Chemical Corporation, and AMVAC Chemical Corporation (collectively referred to hereafter as "the Manufacturing Defendants"), manufactured, sold, distributed, and otherwise placed into the stream of commerce nematocides containing the chemical 1, 2, dibromo 3, chloropropane, commonly known as DBCP, and upon information and belief, sold under the trade names Fumazone by Dow, Nemagon by Shell, DBCP 12 by Occidental, and simply DBCP by AMVAC as well as other more specific trade names.

29.    The Plaintiffs sustained exposure to the Manufacturing Defendants' DBCP as set forth below on or near banana plantations owned, operated, or otherwise controlled by the Dole Food Company, Inc., Dole Fresh Fruit Company, Standard Fruit Company, and Standard Fruit and Steamship Company (collectively referred to hereafter as "the Dole Defendants") in Costa Rica or Ecuador; by Chiquita Fresh North America, LLC (successor in interest to Chiquita Brands, Inc.), Chiquita Brands International, Inc., and Maritrop Trading Corporation, upon information and belief, now Chiquita Brands, LLC, and Chiriqui Land Company, the wholly owned subsidiary and, upon information and belief, the alter ego of Chiquita Brands International, Inc. Chiquita Brands, LLC and Chiquita Fresh North America (collectively referred to hereafter as the "Chiquita Defendants") in Costa Rica or Panama; or by Del Monte in Costa Rica.  The Dole Defendants, the Chiquita Defendants, and Del Monte are referred to collectively as "the Grower Defendants."  The Plaintiffs' exposure to DBCP manufactured by

one or more of the Manufacturing Defendants while present on or near a banana plantation owned, operated, or otherwise controlled by one of the Grower Defendants was a proximate cause of each of the Plaintiff's injuries and illnesses alleged here and as more fully set forth below.

### 1.  Shell Oil Company

30.     Defendant Shell Oil Company ("Shell") is a Delaware corporation with its principal place of business in Texas, which, at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court.   Plaintiffs will request Defendant Shell to waive service in accordance with Federal Rule of Civil Procedure 4(d).

31.     Shell manufactured DBCP under the trade name Nemagon and then sold and distributed the product to Del Monte for use on banana plantations owned, operated or controlled by Del Monte in Costa Rica, to the Dole Defendants for use on banana plantations owned, operated, or controlled by the Dole Defendants in Costa Rica and Ecuador, and to the Chiquita Defendants for use on banana plantations owned, operated, or controlled by the Chiquita Defendants in Panama and Costa Rica.

32.     The use of DBCP as a nematocide was first suggested by researchers at the Pineapple Research Institute ("PRI"), the research arm of the Pineapple Growers Association of Hawaii.  The Pineapple Research Institute (PRI) and the Pineapple Growers Association of Hawaii ("PGAH") were trade associations established principally by Dole and Del Monte, along with a small number of other Hawaiian pineapple growers, but upon information and belief Dole and Del Monte exercised control over the trade association.  With the consent of its members, the PRI assigned the patent for DBCP to both Dow and Shell for further development but retained a royalty interest in the patent.

33.     What little pre-market toxicology research that was done by Shell on DBCP was conducted in or around 1958 by Shell's consultant, Dr. Charles Hine of the University of California Medical School in San Francisco.  In testing DBCP on rats, both labs found that DBCP caused retarded growth, organ damage, shrunken testes, and sterility. In an April 1958 "confidential report," Dr. Hine, working for Defendant Shell, wrote that ***among the rats that died, the gross lesions were especially prominent in lungs, kidneys, and testes.  Testes were usually extremely atrophied. ***Emphasis added.

34.     In May 1961, Dr. Hine, who was now working jointly for Dow and Shell, drafted a report in support of USDA registration of DBCP.  Dr. Hine's draft report called for work place concentrations of DBCP to be kept under one part per million ("ppm") and recommended the use of impermeable protective clothing if skin contact with DBCP was likely.  Louis Lykken, who was in charge of government registration of chemicals for Shell, dismissed the suggestion as "***impractical***." Emphasis added.  After concluding animal studies, Hine included his observation that repeated exposure could affect human reproduction in the draft report to the USDA.  Lykken made Shell's interests clear:  ***Leave out speculation about possible harmful conditions to man. This is not a treatise on safe use.*** Emphasis added.

35.     Although mentioned earlier in this complaint, the preceding and following excerpts from Shell's internal memoranda regarding the labeling and language of precautionary statements for DBCP warrant inclusion here to substantiate specific allegations plead in support Plaintiffs' allegations of Shell's liability.

36.     August 21, 1961:  "We have discussed with Dr. Zavon USDA's precautionary labeling and the hazards associated with this pesticide chemical.  He shares our opinion that USDA is being over cautious in their views on labeling products containing this pesticide

chemical. It is the consensus that Dr. Zavon and a representative of Dow's toxicology group should meet with the USDA toxicology section representatives to settle this issue."

37.     Shortly thereafter, on August 29, 1961: "We have just received and reviewed the subject technical bulletin [an information brochure on Nemagon (Shell's flagship product)] and *have some reservations with regard to the adequacy of the statements under safety precautions. In light of the fact that the threshold of odor detection has been reported at one point at seven parts per million and the lowest level studied [five parts per million] has demonstrated damage after repeated exposures, it appears the statement "there is a good margin of safety in handling" would be difficult to justify and might be prosecuted as negligent."* Emphasis added.

38.     Then on November 9, 1961: "The pesticides regulations branch of the U. S. Department of Agriculture has expressed concern over the hazards associated with the use of Nemagon soil fumigant and proposed stringent labeling for the various formulations now being marketed. It is the consensus in the division office that the USDA is being overly cautious and *the precautionary statements proposed could have an adverse effect on the sale of this product.* Emphasis added.

39.     Shell's conduct as set forth in part above constituted and reflects some of the misstatements and/or omissions of material fact used by Shell to defraud and mislead regulatory authorities, public health authorities, and others, including but not limited to end users such as Plaintiffs, who were in a position to prevent the Plaintiffs from sustaining harmful exposure to DBCP.

40.     Plaintiffs allege that Shell committed the acts and omissions above because it feared precautionary statements that accurately represented the risks posed from exposure to DBCP would adversely affect the sales of DBCP.

41.     The Plaintiffs relied on the lack of adequate precautionary statements on DBCP containers and were therefore unaware of the risks to human health posed from repeated exposure. The lack of adequate precautionary statements on Shell DBCP products was a proximate cause of each Plaintiff's injury who sustained exposure between 1965 through 1977 as more fully set forth *infra* in section IV. B—Plaintiffs—and incorporated by reference as if fully set forth here.

42.     The Plaintiffs also relied on the absence of adequate warnings in their native language and the lack of effective safe use guidelines in their native language that Shell failed to provide with its Nemagon product about the hazards to human health including, but not limited to, the risk of sterility and damage to male sperm production. Shell's acts in misleading regulatory authorities, public health authorities, and Plaintiffs to believe that the risks from exposure to DBCP were not as severe and imminent as Shell knew them to be were a proximate cause of each Plaintiff's DBCP related injury for Plaintiffs who sustained exposure to DBCP between 1965 through 1977 as more fully set forth *infra* in section IV. B—Plaintiffs—and incorporated by reference as if fully set forth here.

43.     Upon information and belief, from 1965 through at least 1971, Shell dominated the DBCP market in Latin America and was the exclusive direct supplier of DBCP to each of the Grower Defendants for their operations in Costa Rica, Panama, and Ecuador up through 1971.

44.     Plaintiffs further allege, upon information and belief, that from 1971 through 1977 Shell continued to sell DBCP to distributors in Costa Rica, Ecuador, and Panama who in turn sold it to banana plantation managers for use on plantations owned, operated, or otherwise controlled by the Dole Defendants in Costa Rica and Ecuador, the Chiquita Defendants in Costa Rica and Panama, and Del Monte in Costa Rica where Plaintiffs sustained exposure to DBCP while on or near those plantations.  As a result of Shell's acts in manufacturing, marketing, distributing, and otherwise placing DBCP into the stream of commerce, Plaintiffs sustained exposure to Shell's Nemagon DBCP between 1965-1977, inclusive, that was a proximate cause of the injuries and illnesses suffered by Plaintiffs as more fully set forth *infra* and fully incorporated herein.

45.     Plaintiffs allege upon information and belief that when Shell placed Nemagon DBCP into the stream of commerce including selling it to local distributors in Plaintiffs' countries, Shell knew, or should have known, that the DBCP would find its way into the geographic locations where Plaintiffs lived and worked and would result in the sustained exposure to Shell Nemagon DBCP that was a proximate cause of their injuries and illnesses for those Plaintiffs who sustained exposure to Shell DBCP between 1965-1977, inclusive.

46.     Upon information and belief, Shell's conduct, including but not limited to the conduct set forth above, constituted assistance to and participation with Dow, Occidental, AMVAC, the Dole Defendants, the Chiquita Defendants, and Del Monte in causing the Plaintiffs' exposure to DBCP in that such exposure was a proximate cause of each Plaintiff's injuries.

### 2. The Dow Chemical Company

47.     Defendant The Dow Chemical Company ("Dow")  is  a  Delaware  corporation with its principal place of business in Michigan and which, at all times pertinent herein, was authorized to do and was doing  business within the jurisdiction of this Honorable Court. Plaintiffs have requested that Defendant Dow waive service in accordance with Federal Rule of Civil Procedure 4(d).

48.     Dow participated in the development and design of DBCP together with Shell. Dow manufactured DBCP and marketed it under the trade name Fumazone.

49.     Dow's first in-house report on DBCP came in July 1958 and concluded that DBCP was ***"readily absorbed through the skin and high in toxicity in inhalation."***  Dow's data also showed that ***"liver, lung and kidney effects might be expected"*** and that ***"testicular atrophy may result from prolonged, repeated exposure."*** Emphasis added.

50.     In May 1961, Dr. Hine, who worked jointly for Dow and Shell, drafted a report in support of USDA registration of DBCP that called for work place concentrations of DBCP to be kept under one part per million ("ppm") and recommended the use of impermeable protective clothing if skin contact with DBCP was likely.

51.     When scientists working for Dow informed Dow corporate decision makers of evidence that DBCP caused a series of health problems, Dow intentionally played down the health risks and resisted warning about DBCP's dangers because of the negative effect Dow believed such warnings would have on sales of DBCP.

52.     The toxicology card for Dow's flagship product Fumazone, filed in Dow's medical library, noted eye and skin effects, and stated that testicular damage "***may result from chronic exposure to active material***." Emphasis added.  Liver and kidney damage were also discussed in

the 1958-1961 time period. But the toxicology cards were soon altered to delete information on testicular damage.   Dr. Torkelson would later opine that, "***the cards addressed singular exposures, and you don't see testicular changes on single exposures.  It was put on some of the cards because whoever wrote it knew about it and thought it was important enough to put it on there along with liver and kidney affects.  When it was retested, the testes didn't show an affect from a single exposure, and a new card was made out***."  Emphasis added.

53.     Dow's conduct, as set forth in part above, constitutes and reflects some of the misstatements and/or omissions of material fact used by Dow to defraud, deceive, and mislead regulatory authorities and others, including but not limited to end users such as Plaintiffs, who were in a position to prevent the Plaintiffs from sustaining harmful exposures to DBCP.

54.     Plaintiffs allege that Dow committed the acts and omissions above because it feared precautionary statements that accurately represented the health risks posed from exposure to DBCP would adversely affect the sales of DBCP.

55.     The Plaintiffs relied on the lack of adequate precautionary statements for Dow's DBCP products and were therefore unaware of the risks to human health posed from repeated exposure.  The diminished and ineffectual statements that Dow successfully promoted to downplay the risks that DBCP posed to human health affected all precautionary statements that accompanied all manufacturers' DBCP products through 1978 and was a proximate cause of each Plaintiff's injury who sustained exposure through 1978, as more fully set forth *infra* in section IV. B—Plaintiffs—and incorporated by reference as if fully set forth here.

56.     The Plaintiffs also relied on the absence of adequate warnings in their native language and the lack of effective safe use guidelines in their native language that Dow failed to provide with its Fumazone product about the hazards to human health, including but not limited

to the risk of sterility and damage to male sperm production.  Dow's acts in misleading regulatory authorities, public health authorities, and Plaintiffs into believing that the risks from exposure to DBCP were not as severe and imminent as Dow knew them to be was a proximate cause of each Plaintiff's DBCP related injury for Plaintiffs who sustained exposure to DBCP through 1979 as more fully set forth *infra* in section IV. B—The Plaintiffs—and incorporated by reference as if fully set forth here.

57.     Upon information and belief, from at least 1971 through 1977, Dow was the exclusive direct supplier of DBCP to the Grower Defendants in Panama, Ecuador, and Costa Rica including the Dole Defendants, the Chiquita Defendants, and Del Monte, and continued to supply these Grower Defendants with DBCP through at least 1978.

58.     Plaintiffs allege upon information and belief that Dow Fumazone was a source of exposure for each Plaintiff who sustained exposure to DBCP from 1971 through 1978.

59.     Plaintiffs further allege that as a result of Dow's acts in manufacturing, marketing, distributing, and otherwise placing into the stream of commerce DBCP, Plaintiffs sustained exposure to Dow's DBCP that was a proximate cause of the injuries and illnesses suffered by Plaintiffs, as more fully set forth *infra* and fully incorporated herein.

60.     Plaintiffs allege upon information and belief that when Dow placed Fumazone DBCP into the stream of commerce, Dow knew, or should have known, that the DBCP would find its way in to the geographic locations where Plaintiffs lived and worked and would be a substantial source of the exposure those Plaintiffs sustained to DBCP that was a proximate cause of Plaintiffs' DBCP related injuries and illnesses.

61.     Dow manufactured, marketed, and sold Fumazone DBCP to the Dole Defendants, including Standard Fruit Company, from at least 1971 through 1978, who used Fumazone on the

banana plantations they owned, operated, or otherwise controlled in Costa Rica and Ecuador where certain Plaintiffs sustained exposure to Dow DBCP that was a proximate cause of these Plaintiffs' injuries as more fully set forth *infra* in section IV. B—The Plaintiffs—and incorporated by reference as if fully set forth here.

62.     Dow manufactured, marketed, and sold Fumazone DBCP to the Chiquita Defendants from at least 1971 through 1977 who used Dow Fumazone DBCP on the banana plantations they owned, operated or otherwise controlled in Costa Rica and Panama where certain Plaintiffs sustained exposure to Dow DBCP that was a proximate cause of these Plaintiffs' injuries as more fully set forth *infra* in section IV. B—The Plaintiffs—and incorporated by reference as if fully set forth here.

63.     Dow manufactured, marketed, and sold Fumazone DBCP to Del Monte from at least 1971 through 1977 who used Dow DBCP on the banana plantations it owned, operated, or otherwise controlled in Costa Rica where certain Costa Rican Plaintiffs sustained exposure to Dow DBCP that was a proximate cause of their injuries as more fully set forth *infra* in section IV. B—The Plaintiffs--and incorporated by reference as if fully set forth here.

64.     Upon information and belief, Dow's conduct, including but not limited to the conduct set forth above, constituted assistance to and participation with Shell, Occidental, AMVAC, the Dole Defendants, the Chiquita Defendants, and Del Monte in causing the Plaintiffs' exposure to DBCP that was a proximate cause of their DBCP related injuries. Dow failed to provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP and failed to provide adequate safe use guidelines for handling DBCP that would protect those exposed from suffering DBCP exposure related injuries,

illnesses, and adverse health conditions for those Plaintiffs who sustained DBCP exposure through 1979.

### 3. Occidental Chemical Company

65.     Defendant Occidental Chemical Corporation ("Occidental") is a New York corporation with its principal place of business in Texas, which, at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court. Plaintiffs have requested Defendant Occidental to waive service in accordance with Federal Rule of Civil Procedure 4(d). Occidental manufactured DBCP under its own label DBCP 12. Occidental also manufactured DBCP for The Dow Chemical Company who re-labeled it Fumazone and then placed it into the stream of commerce that resulted in Plaintiffs' exposure to DBCP.

66.     Upon information and belief, Plaintiffs from Costa Rica sustained exposure to DBCP manufactured by Occidental and sold under the trade names DBCP 12 or Fumazone as relabeled by Dow from 1971 through 1979 when they lived, worked, or were otherwise present on or around the Costa Rican banana plantations owned, operated, or otherwise controlled by the Dole Defendants, the Chiquita Defendants, or Del Monte, that was a proximate cause of the Costa Rican Plaintiffs' injuries.

67.     Upon information and belief, Plaintiffs from Panama sustained exposure to DBCP manufactured by Occidental under the trade names DBCP 12 and/or Fumazone from 1971 through 1979 when they lived, worked, or were otherwise present on or around the Panamanian banana plantations owned, operated, or otherwise controlled by the Chiquita Defendants that was a proximate cause of the Panamanian Plaintiffs' injuries.

68.     Upon information and belief, Plaintiffs from Ecuador sustained exposure to DBCP manufactured by Occidental under the trade names DBCP 12 and/or Fumazone from 1971 through 1979 when they lived, worked, or otherwise were present on or around the banana plantations owned, operated, or otherwise controlled by the Dole Defendants in Ecuador that was a proximate cause of the Ecuadoran Plaintiffs' injuries.

69.     Upon information and belief, Occidental's conduct in formulating DBCP for Dow that Dow rebranded as Fumazone and in manufacturing and marketing DBCP under its own label DBCP 12 and selling and distributing it for use on banana plantations in Panama, Ecuador, and Costa Rica constituted assistance to and participation with Shell, Dow, AMVAC, the Dole Defendants, the Chiquita Defendants, and Del Monte in causing the Plaintiffs' exposure to DBCP that was a proximate cause of Plaintiffs' injuries.  Plaintiffs further allege, upon information and belief, that Occidental failed to provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP and failed to provide adequate safe use guidelines for handling DBCP that would have protected Plaintiffs from suffering DBCP exposure related injuries, illnesses, and adverse health conditions and such conduct was a proximate cause of those Plaintiffs' injuries who sustained exposure to DBCP that Occidental formulated, manufactured, marketed, or otherwise placed into the stream of commerce.

### 4.  AMVAC Chemical Corporation

70.     Defendant AMVAC Chemical Corporation ("AMVAC") is a California corporation with its principal place of business in California, which at all times pertinent herein was authorized to do and was doing business within the jurisdiction of this Honorable Court.

Plaintiffs have requested that Defendant AMVAC waive service in accordance with Federal Rule of Civil Procedure 4(d).

71.     AMVAC began manufacturing, marketing, and distributing DBCP in 1964. AMVAC deliberately entered the Latin American market to supply multinational banana growers including the Dole Defendants after the United States EPA severely limited the permissible uses for DBCP in 1977 because AMVAC perceived a market opportunity when it believed, erroneously, that Dow, Shell, and Occidental had exited the international market for DBCP.  AMVAC described this business strategy in documents filed with the U.S. Securities and Exchange Commission in 1978:

> [AMVAC] Management believes that because of the extensive publicity and notoriety that has arisen over the sterility of workers and the suspected mutagenic (alterations in living cells) and carcinogenic nature of DBCP, the principal manufacturers and distributors of this product (Dow, Occidental and Shell) have temporarily, at least, decided to remove themselves from the domestic marketplace and possibly from the world marketplace….Notwithstanding all the publicity and notoriety surrounding DBCP it was [AMVAC] Chemical's opinion that a vacuum existed in the marketplace that [AMVAC] Chemical could temporarily occupy providing [AMVAC] Chemical met all the requirements imposed by a variety of governmental bodies at  various levels.

>                         *   *   *   *   *

> Beginning early January 1978, [AMVAC] Chemical began receiving a limited quantity of DBCP from a Mexican manufacturer.  Subsequently a second foreign manufacturer also began supplying small quantities of product….The combined sales of DBCP along with other manufactured products continues to sustain [AMVAC] Chemical's operations…An additional problem confronting [AMVAC] Chemical is product liability exposure.

See AMVAC Form 10k for the fiscal year ended December 31, 1977.

72.     Upon information and belief, Dow also benefited from AMVAC's sales of DBCP because AMVAC paid Dow a 3% royalty on all DBCP sold by AMVAC under a patenting agreement.

73.     Upon information and belief, based on the statement of a former AMVAC executive, AMVAC continued to sell DBCP after the [EPA] ban *"anywhere in the world where bananas, pineapples, citrus and cotton are grown".* Emphasis added. According to this former AMVAC executive, *"there's no problem with the ban of DBCP.  In fact, it was the best thing that could've happened for us.  You can't sell it here [the United States] anymore but you can sell it anywhere else.  Our big market has always been exports anyway."* Emphasis added.

Circle of Poison—Pesticides and People in a Hungry World (FF, 1981, p. 104), Chapter 3.

74.     Plaintiffs allege that AMVAC sold DBCP from 1978 through at least 1985, and upon information and belief, thereafter, to local distributors in Costa Rica from whom farm managers working for Chiquita, Del Monte, or the Dole Defendants purchased DBCP, despite the United States Environmental Protection Agency's (EPA) imposition of a ban on sales of DBCP in the U. S. market.

75.     Upon information and belief, Plaintiffs from Costa Rica who sustained exposure to AMVAC DBCP from 1978 until approximately 1985 or thereafter used on or around the banana plantations owned, operated, or otherwise controlled by Dole, Chiquita, or Del Monte in Costa Rica, allege that exposure to AMVAC DBCP was a proximate cause of their injuries.

76.     Upon information and belief, AMVAC sold DBCP from 1978 through at least 1985, and upon information and belief, thereafter, to local distributors in Panama from whom farm managers working for the Chiquita Defendants continued to purchase DBCP for use on banana plantations owned, operated, or controlled by Chiquita.

77.     Upon information and belief, Plaintiffs from Panama who sustained exposure to AMVAC DBCP from 1978 through 1985 or thereafter where they lived, worked, or were otherwise present on or around the banana plantations owned, operated, or otherwise controlled

by Chiquita allege that exposure to AMVAC DBCP was a proximate cause of the Panamanian Plaintiffs' injuries.

78.     Upon information and belief, AMVAC sold DBCP from 1978 through at least 1985, and upon information and belief, thereafter, to local distributors in Ecuador from whom farm managers working for the Dole Defendants purchased DBCP for use on banana plantations owned, operated, or controlled by Dole.

79.     Upon information and belief, Plaintiffs from Ecuador who sustained exposure to AMVAC DBCP from 1978 through 1985 or thereafter where they lived, worked, or were otherwise present on or around the banana plantations owned, operated, or otherwise controlled by the Dole Defendants allege that exposure to AMVAC DBCP was a proximate cause of the Ecuadoran Plaintiffs' injuries.

80.     Plaintiffs incorporate by reference all previous allegations as if fully set forth herein.  Upon information and belief, AMVAC's conduct, including but not limited to the conduct set forth above, constituted assistance to and participation with Shell, Dow, Occidental, the Dole Defendants, the Chiquita Defendants, and Del Monte in causing the Plaintiffs' DBCP related injuries for Plaintiffs who sustained exposure to DBCP from 1978 and thereafter which was a proximate cause of their injuries, in that AMVAC continued to sell and distribute DBCP to the Grower Defendants while consciously disregarding the risks posed to human health from exposure to DBCP; in that AMVAC failed to provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP; and in that AMVAC failed to provide adequate safe use guidelines in the Plaintiffs' native language for handling DBCP that would have protected those exposed to DBCP such as Plaintiffs from suffering DBCP exposure related injuries, illnesses, and adverse health conditions.

### 5.   The Dole Defendants

81.     Dole Food Company, Inc. ("Dole Food") is a Delaware corporation with its principal place of business in California, which at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court.  Dole Food Company, Inc. is the successor in interest to both Standard Fruit Company and Standard Fruit & Steamship Company.[1]  Plaintiffs have requested that Defendant Dole Food waive service in accordance with Federal Rule of Civil Procedure 4(d).

82.     Dole, principally through its predecessors in interest, including but not limited to Standard Fruit Company, owned, operated, or otherwise controlled commercial banana plantations in Ecuador and Costa Rica where those Plaintiffs who were present on their plantations sustained exposure to DBCP as more fully alleged below.

83.     Dole Food and/or its predecessors in interest was also the principal entity that founded and controlled the Pineapple Grower's Association of Hawaii, the trade association that initially developed DBCP for use on Hawaii pineapple plantations through its research arm the Pineapple Research Institute (PRI).

84.     Defendant, Dole Fresh Fruit Company ("Dole Fresh Fruit") is a Nevada corporation with its principal place of business in California.  Dole Fresh Fruit Company is an alter ego/agent of Standard Fruit Company, Standard Fruit and Steamship Company, and Dole Food Company, Inc.  These corporate entities are so integrated with the Dole Fresh Fruit Company that they are the alter ego/agent of Dole Fresh Fruit Company and at all times pertinent

---

[1]   Dole Pineapple Corporation was one of the "Big 5" Hawaii Pineapple companies. It was bought by another large Hawaii company known as Castle and Cooke.  Castle and Cooke subsequently bought Standard Fruit Company and Standard Fruit and Steamship Company.  Standard Fruit owned or operated banana growing operations in Central and South America.  Castle and Cooke's Standard Fruit division then began using its Dole brand on its bananas. Eventually, Castle and Cooke changed its name to Dole Food Company, Inc. making the name of its company and the name on its bananas both Dole.

herein, Dole Fresh Fruit Co. was authorized to do and was doing business within the jurisdiction of this Honorable Court. Plaintiffs have requested Defendant Dole Fresh Fruit waive service in accordance with Federal Rule of Civil Procedure 4(d).

85. Defendant Standard Fruit Company ("Standard Fruit") is a Delaware corporation, with its principal place of business in California which, at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court. Plaintiffs have requested Defendant Standard Fruit to waive service in accordance with Federal Rule of Civil Procedure 4(d).

86. Upon information and belief, Plaintiffs allege that Standard Fruit is a wholly owned shell corporation of Dole Food Company that is the alter ego of Defendant Dole Food Company and Dole Fresh Fruit Company.

87. Standard Fruit owned, operated, or otherwise controlled the banana plantations where Plaintiffs from Ecuador and some Plaintiffs from Costa Rica lived or worked around DBCP, and where these Plaintiffs sustained exposure to the DBCP that Standard Fruit specified be used on those plantations.

88. Defendant Standard Fruit and Steamship Company ("Standard Fruit and Steamship") is a Delaware corporation with its principal place of business in California, which, at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court. Upon information and belief, Plaintiffs allege that Standard Fruit and Steamship Company is a wholly owned shell corporation of Dole Food Company that is the alter ego of Defendant Dole Food Company and Dole Fresh Fruit Company and Standard Fruit Company. Standard Fruit and Steamship was involved in purchasing, distributing, and otherwise placing into the stream of commerce DBCP for use on banana plantations owned, operated, or

otherwise controlled by the Dole Defendants where those Plaintiffs from Costa Rica and Ecuador who sustained exposure to DBCP while present on or near those plantations.  Plaintiffs have requested that Defendant Standard Fruit and Steamship waive service in accordance with Federal Rule of Civil Procedure 4(d).

89.     Dole Food Company, Inc., Standard Fruit Company, Standard Fruit and Steamship Company, and Dole Fresh Fruit Company are referred to collectively as the "Dole Defendants."

90.     Standard Fruit's production manual contained no warnings of the testicular effects of DBCP, and did not advise the use of safety gear or provide reasons for workers to take precautions against adverse health effects from exposure.

91.     In fact, in a March 3, 1978 memorandum regarding DBCP safe handling procedures, Dr. Jack Dement, the director of the Dole Defendants' worldwide pest control efforts, actually directed plantation managers to ignore proposed guidelines for DBCP use, even after the EPA suspended use of DBCP in the United States.  Regarding a guideline "not [to] apply DBCP unless the treated area was a safe distance away from worker housing and work areas or unless all people had been evacuated from those surrounding areas," Dr. Dement wrote, "***This is not operationally feasible and does not need to be implemented***." Emphasis added.  Dr. Dement's memorandum went on to indicate that, "***only personnel working at the DBCP pump, rather than applicators, should be provided respiratory devices for the protection against DBCP vapors***." Emphasis added.

92.     Upon information and belief, the Dole Defendant's conduct, including but not limited to the conduct set forth above as well as its role in controlling, funding, and authorizing the PGAH to license the patent for DBCP to Dow and Shell, and then consciously disregarding

the risks posed to human health from exposure to DBCP by requiring workers on Dole plantations to use DBCP despite the fact the Dole Defendants knew or should have known about the health risks was a proximate cause of Plaintiffs' injuries. Moreover, in addition to the conduct alleged above, the Dole Defendants' failure to provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP and failure to provide adequate safe use guidelines for handling DBCP that would protect those exposed from suffering DBCP exposure related injuries, illnesses, and adverse health conditions constituted assistance to and participation with Shell, Dow, Occidental, AMVAC, the Chiquita Defendants, and Del Monte that resulted in the Plaintiffs' exposure to DBCP that was a proximate cause of Plaintiffs' injuries.

### 6. Del Monte

93.     Defendant Del Monte Fresh Produce, N.A. ("Del Monte") is a Florida corporation with its principal place of business in Florida, which, at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court. Del Monte used DBCP on the banana plantations it owned, operated or otherwise controlled in Costa Rica where Costa Rican Plaintiffs who worked on Del Monte controlled plantations sustained exposure to DBCP which was a proximate cause of their DBCP related injuries. Plaintiffs have requested Defendant Del Monte to waive service in accordance with Federal Rule of Civil Procedure 4(d).

94.     Del Monte is a part of the international fruit empire that had its roots in selling pineapples grown on plantations in Hawaii. Del Monte, along with the Dole Food Company and/or its predecessors in interest were instrumental in forming and then controlling the Pineapple Growers Association of Hawaii (PGAH), the trade association whose research arm, the Pineapple Research Institute (PRI), first developed and tested DBCP in Hawaii beginning the

1950s. The PGAH and its principal members Dole and Del Monte participated in the development of DBCP, first for use on pineapple, and then after further development by Shell and Dow, for use by commercial fruit growers, including Dole, Del Monte, and Chiquita on commercial banana growing plantations and in other commercial fruit cultivation.  Del Monte and the Dole Defendants during the years leading up to 1958 and continuing thereafter until at least 1965 were in such control of the PGAH that they possessed the institutional knowledge of the PGAH, including but not limited to specific knowledge about a joint Dow and Shell report issued in or around 1961 that revealed the risks of damage to the reproductive capacities of mammals exposed to DBCP in very small amounts.

95.    Upon information and belief, Del Monte's conduct in controlling, funding, and authorizing the PGAH to license the patent for DBCP to Dow and Shell, in failing to require or provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP, and in failing to require or provide adequate safe use guidelines for handling DBCP to protect those exposed from suffering DBCP exposure related injuries, illnesses, and adverse health conditions constituted assistance to and participation with Shell, Dow, Occidental, AMVAC, the Dole Defendants, and the Chiquita Defendants that resulted in the Plaintiffs' exposure to DBCP which was a proximate cause of their injuries.

### 7.  The Chiquita Defendants

96.    Defendant Chiquita Brands International, Inc. ("Chiquita Brands International") is a New Jersey corporation with its principal place of business in Ohio, which, at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court. On June 1970, United Fruit Company changed its name to United Brands Company.  On March 20, 1990, United Brands Company changed its name to Chiquita Brands

International, Inc.  Plaintiffs further allege that upon information and belief that Chiquita Brands International, Inc. is the successor in interest to United Fruit Company and United Brands Company, Inc. who were authorized to do and were doing business within the jurisdiction of this Honorable Court during times pertinent to this litigation.

97.     Chiquita Brands International, individually and through its predecessors in interest and/or alter egos including but not necessarily limited to Chiriqui Land Company, owned, operated, or otherwise controlled commercial banana plantations where Plaintiffs from Panama and some from Costa Rica sustained exposure to the DBCP that was a proximate cause of these Plaintiffs' injuries. Plaintiffs have requested Defendant Chiquita Brands International to waive service in accordance with Federal Rule of Civil Procedure 4(d).

98.     Defendant Chiquita Fresh North America L.L.C. ("Chiquita Fresh") was formerly known as Chiquita Brands, Inc.  On August 30, 1939, Fruit Dispatch Company was incorporated in Delaware.  Fruit Dispatch Company changed its name to United Fruit Sales Corporation on August 8, 1962. United Fruit Sales Corporation  changed its name to Chiquita Brands, Inc. on April 10, 1970.   Chiquita Brands, Inc. changed its name to Chiquita Brands Company, North America on December 3, 1986.  Chiquita and Brands Company, North America changed its name to Chiquita Fresh North America L.L.C.is a Delaware limited liability company with its principal place of business in Ohio, which, at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court.  Plaintiffs have requested Chiquita Fresh North America to waive service in accordance with Federal Rule of Civil Procedure 4(d).

99.     Maritrop Trading Corporation ("Maritrop Trading") was incorporated on March 289, 1946 in Delaware.  Maritrop Trading Corporation changed its name to United Fruit Trading

Corporation on January 31, 1963.  United Fruit Trading Corporation changed its name back to Maritrop Trading Corporation on January 1, 1969.  Maritrop Trading Corporation converted to a Delaware limited liability company on December 22, 2000 to become Maritrop Trading L.L.C. Maritrop Trading L.L.C. was merged into Chiquita Brands, L.L.C. on December 27, 2004 (Chiquita Brands, L.L.C. was originally incorporated in Delaware in 1986 as a different Chiquita Brands Inc. from the Chiquita Brands, Inc. now known as Chiquita Fresh North America).  Upon information and belief, Maritrop Trading Corporation maintained principal places of business in Boston, New York,  New Orleans, and Ohio at various times, but, at all times pertinent herein, was authorized to do and was doing business within the jurisdiction of this Honorable Court.

100.    Upon information and belief, Maritrop Trading was the distribution arm of Chiquita Fresh and Chiquita Brands International and its predecessors in interest.  In this role, Maritrop was involved in purchasing, distributing, transporting, or otherwise placing into the stream of commerce DBCP for use on the banana plantations owned, operated, or otherwise controlled by the Chiquita Defendants or their predecessors in interest in Panama and Costa Rica. Maritrop Trading's role in placing DBCP into the stream of commerce was a proximate cause of the DBCP related injuries of Plaintiffs from Panama and Costa Rica who sustained exposure to DBCP on Chiquita controlled plantations

101.    Chiquita Brands International, Chiquita Fresh North America, and Chiquita L.L.C. individually and through its predecessors in interest and/or alter egos, including but not necessarily limited to Chiriqui Land Company, owned, operated or otherwise controlled commercial banana plantations in Panama and Costa Rica where Plaintiffs from Panama and Costa Rica working on Chiquita Plantations sustained exposure to DBCP required to be used by the Chiquita Defendants and that was a proximate cause of these Plaintiffs' injuries.

102.     Chiquita Fresh is the alter ego/agent of Chiquita Brands International, Inc., Chiquita Brands, L.L.C. as successor in interest to the Maritrop Trading Corporation and Chiriqui Land Company who were authorized to do and were doing business within the jurisdiction of this Honorable Court during times pertinent to this litigation.  Chiquita Fresh and Chiquita Brands International are the successors in interest and/or alter ego or agent of United Fruit Company, United Brands Company Inc., and Chiriqui Land Company. Chiquita Brands, L.L.C. Chiquita Brands International, Chiquita Fresh, Chiquita L.L.C., and the Chiriqui Land Company and its successors and alter egos are collectively referred to as the "Chiquita Defendants".

103.     Standard Fruit Company, Standard Fruit and Steamship Company, Dole Food Company, Inc., Dole Fresh Fruit Company, Chiquita Brands International, Inc., Chiquita Fresh, Chiquita Brands, L.L.C. (as successor in interest to Maritrop Trading Corporation), and Del Monte Fresh Produce, N.A. distributed and/or used nematocides containing the chemical dibromo chloropropane, commonly known as DBCP, including those sold under the trade names Fumazone, Nemagon, DBCP 12 and simply DBCP or derivatives thereof on the banana plantations they owned, operated, or otherwise controlled where the Plaintiffs lived,  worked or were otherwise present that resulted in Plaintiffs' exposure to DBCP and subsequent DBCP related adverse health effects and injuries. These Defendants are collectively referred to as the "Grower Defendants".

### B.      The Plaintiffs

104.     Plaintiffs are citizens of Ecuador and Panama. The Plaintiffs have had their health, welfare, and lives damaged from exposure to dibromo chloropropane ("DBCP"), an

extremely hazardous chemical pesticide, manufactured, distributed, or used by the Defendants on the plantations where the Plaintiffs sustained exposure to DBCP.

105.     Plaintiffs have brought this lawsuit to recover compensation for damages to their health, welfare, and wellbeing that resulted from exposure to DBCP that was the proximate cause of their DBCP related injuries, including, but not limited to, sterility, abnormally low sperm quantity and defective sperm quality as well as an increased risk of cancer and the subsequent fear of developing cancer. Certain of the Plaintiffs have sustained vision loss from cornea damage, chronic skin disorders, compromised renal systems, and damage to their pulmonary and respiratory systems as more fully set forth below.

106.     In addition, Plaintiffs have brought this lawsuit for the costs of medical monitoring necessary to monitor and treat the development of those conditions, including cancer, caused by the Manufacturing Defendants' conduct and the conduct of the individual Grower Defendants whose use of DBCP was the source of the individual Plaintiffs' exposure, as set forth in greater detail below in sub sections 1-2 *infra*.

107.     Plaintiffs allege that Shell was the exclusive direct supplier of DBCP to Standard Fruit Company, Standard Fruit and Steamship Company, Castle & Cooke Co. (predecessor to Dole Food Company), United Fruit Co. (predecessor to Chiquita), and the Del Monte Co. from 1965 through 1971.  Plaintiffs further allege, upon information and belief, that Shell continued to market, distribute, and sell DBCP containing products after 1971 in the geographic region where certain Plaintiffs sustained exposure to DBCP and hereby put Shell on notice that Plaintiffs anticipate developing evidence of certain Plaintiffs' exposure to Shell DBCP to support amended allegations by those Plaintiffs to assert exposure to Shell DBCP products after 1971.

108.    Plaintiffs allege that Dow was the exclusive direct supplier of DBCP to Standard Fruit Company, Standard Fruit and Steamship Company, Castle & Cooke Co. (predecessor to Dole Food Company), United Fruit Co. (predecessor to Chiquita), and the Del Monte Co. from 1971 to 1977 and continued to supply the Dole Defendants with DBCP in 1978.

109.    Plaintiffs allege Occidental supplied DBCP to Standard Fruit Company, Standard Fruit and Steamship Company, Castle & Cooke Co. (predecessor to Dole Food Company), United Fruit Co. (predecessor to Chiquita) for use on bananas in Panama and the Del Monte Co. in 1978.

110.    Plaintiffs allege AMVAC supplied DBCP to Standard Fruit Company, Standard Fruit and Steamship Company, Castle & Cooke Co. (predecessor to Dole Food Company), United Fruit Co. (predecessor to Chiquita), and the Del Monte Co. from at least 1978 through at least 1985 and thereafter.

111.    Plaintiffs who sustained exposure only on plantations owned, operated, or controlled by either the Dole Defendants or Del Monte do not assert any causes of action against the Chiquita Defendants.  All Plaintiffs who sustained exposure to DBCP assert causes of action for negligence, concert of action, conspiracy, participation and assistance,  medical monitoring, and enhanced risk against the Dole Defendants and Del Monte for their role in developing DBCP and placing it into the stream of commerce through their control of the Pineapple Grower's Association of Hawaii.

### 1.    Plaintiffs from Panama

112.    Plaintiffs Luis Antonio **Aguilar Marquinez**, Daniel **Serrano Chito**, Federico **Salinas Jimenez,** and Jacinto **Martinez Ibarra**  are citizens of Panama and worked on one or more banana plantations owned, operated, or otherwise controlled in Panama by Chiquita,

Chiquita Brands International, or its predecessors in interest and/or alter egos including but not limited to the Chiriqui Land Company.  These Plaintiffs allege that the actions of the particular manufacturing Defendants to whose DBCP products each Plaintiff alleges exposure designed, manufactured, marketed, and distributed DBCP that was unreasonably dangerous for the intended use and failed to adequately warn or to otherwise advise the Plaintiff of the hazards associated with exposure and such actions were a substantial factor in causing the injuries complained of by Plaintiff.  These Plaintiffs further allege that the particular actions of the Grower Defendants in directing and/or requiring the use of DBCP without adequate safety precautions on the banana plantations they owned, operated, or otherwise controlled where each Plaintiff sustained exposure were a substantial factor in causing the injuries complained of by Plaintiff.  Additional facts upon which their claims are based against the various Defendants are more fully set forth below.

113.  Panamanian Plaintiff  **Luis Antonio Aguilar Marquinez** alleges he sustained repeated exposure to Dow DBCP in Panama during 1972 while working as a DBCP applicator on one or more of the following banana plantations owned and operated, or otherwise controlled by the Chiquita Defendants: Finca Corredor, Finca Higuito, Finca Majagua.  As a result of his DBCP exposure Luis Antonio Aguilar Marquinez suffers from the following DBCP related medical conditions: infertility due to abnormally low and/or defective sperm, a compromised renal system, central nervous system damage, and enhanced risk of injury from exposure to DBCP.

114.  Panamanian Plaintiff **Daniel Serrano Chito** alleges he sustained repeated exposure to Dow DBCP in Panama during 1973 - 1975 while working as a DBCP applicator on one or more banana plantations owned, operated, or otherwise controlled by the Chiquita

Defendants: Chiriqui Land Company Finca 4 and Finca 67.  As a result of his DBCP exposure Daniel Serrano Chito suffers from the following DBCP related medical conditions: infertility due to abnormally low and/or defective sperm, a compromised renal system, vision loss, chronic urinary tract infections and enhanced risk of injury from exposure to DBCP.

115.    Panamanian Plaintiff **Federico Salinas Jimenez** alleges he sustained repeated exposure to Dow DBCP during 1976 while working as a DBCP applicator in Panama on the following banana plantation owned, operated, or otherwise controlled by the Chiquita Defendants: Chiriqui Land Company Finca 13.  As a result of his DBCP exposure Federico Salinas Jimenez suffers from the following DBCP related medical conditions: infertility due to abnormally low and/or defective sperm, testicular problems, nervous system damage and enhanced risk of injury from exposure to DBCP.

116.    Panamanian Plaintiff **Jacinto Martinez Ibarra** alleges he sustained repeated exposure in Panama to Shell DBCP during 1970-1971, Dow DBCP in during 1972 - 1978, Occidental DBCP in 1978, and AMVAC DBCP during 1978-1984 while working as a DBCP applicator on the following banana plantation owned, operated, or otherwise controlled by the Chiquita Defendants: Finca Blanco.  As a result of his DBCP exposure Jacinto Martinez Ibarra suffers from the following DBCP related medical conditions: infertility due to abnormally low and/or defective sperm, a compromised renal system, chronic skin conditions and enhanced risk of injury from exposure to DBCP.

## 2.    Plaintiffs from Ecuador

117.    Plaintiffs Guzman **Castro Epifano**, Luis Alberto **Pesantez Redrovan,** and Heris Geovanny **Malla Lopez**  are citizens of Ecuador.    These Plaintiffs allege that the actions of the particular Manufacturing Defendants to whose DBCP products each Plaintiff alleges exposure

designed, manufactured, marketed, and distributed DBCP that was unreasonably dangerous for the intended use and failed to adequately warn or to otherwise advise the Plaintiff of the hazards associated with exposure and such actions were a substantial factor in causing the injuries complained of by Plaintiff. These Plaintiffs further allege that the particular actions of the Grower Defendants in directing and/or requiring the use of DBCP without adequate safety precautions on the banana plantations they owned, operated, or otherwise controlled where each Plaintiff sustained exposure were a substantial factor in causing the injuries complained of by Plaintiff.

118. Ecuadorian Plaintiff **Guzman Castro Epifano** alleges he sustained repeated exposure to Dow DBCP 1972 – 1978, Occidental DBCP in 1978, and AMVAC DBCP during 1978 - 1980 while working as a DBCP applicator on the following banana plantation owned, operated, or otherwise controlled by the Dole Defendants: Finca Los Alamos. As a result of his DBCP exposure Guzman Castro Epifano suffers from the following DBCP related medical conditions: infertility due to abnormally low and/or defective sperm, compromised renal system and enhanced risk of injury from exposure to DBCP.

119. Ecuadorian Plaintiff **Luis Alberto Pesantez Redrovan** alleges he sustained repeated exposure to Dow DBCP and Occidental DBCP in Ecuador during 1978 and AMVAC DBCP during 1978 - 1982 while working as a DBCP applicator on the following banana plantation owned, operated, or otherwise controlled by the Dole Defendants: Hacienda Lote 1. As a result of his DBCP exposure Luis Alberto Pesantez Redrovan suffers from the following DBCP related medical conditions: infertility due to abnormally low and/or defective sperm, chronic DBCP related gastro-intenstinal problems, chronic headaches and body pain, compromised renal system and enhanced risk of injury from exposure to DBCP.

120.     Ecuadorian Plaintiff **Heris Geovanny Malla Lopez** alleges he sustained repeated exposure to Dow DBCP in Ecuador during 1974 – 1975 while working as a Laborer around DBCP applicators on the following banana plantation owned, operated, or otherwise controlled by the Dole Defendants: Finca Servio Serrano. As a result of his DBCP exposure, Heris Geovanny Malla Lopez suffers from the following DBCP related medical conditions: infertility due to abnormally low and/or defective sperm, colon related complications, compromised renal system and enhanced risk of injury from exposure to DBCP.

### 3.      Tolling of Limitations

121.     On August 31, 1993, a group of similarly situated Plaintiffs who had sustained exposure to the Manufacturing Defendants' DBCP on banana plantations owned, operated, or otherwise controlled by the Grower Defendants filed a class action in Texas.  The case was initially styled *Armando Ramos Bermudez et al. v. Shell Oil Co., et al.*, Cause No. 93-C-2290, in the 23$^{rd}$Judicial District Court of Brazoria County, Texas.  The class allegations defined the class as follows:

> All banana workers were occupationally exposed between the years 1965 and 1990 to dibromo chloropropane (DBCP) or DBCP-containing products, manufactured or distributed by Shell Oil Company, Dow Chemical Company or Occidental Chemical Corporation, and who have suffered server injury to their reproductive capacity.

122.     The Class action allegations were amended on February 16, 1994.   The amendment changed the name of the lead Plaintiff to Jorge Colindres Carcamo and defined the class as follows:

> All persons exposed to DBCP or DBCP-containing products. Designed, manufactured, marketed, distributed or used by Defendants between 1965 and 1990 in the following countries: (1) Honduras, (2) Costa Rica, (3) Guatemala, (4) Panama, (5) Nicaragua. (6) Mexico, (7) Venezuela, (8) Ecuador, (9) Argentina,

(10) Dominica. (11) St. Lucia, (12) St. Vincent. (13) Dominican Republic, (14) Ivory Coast, (16) Burkina Faso, (16) Senegal, (17) Cameroon, (18) Tanzania, (19) Philippines, (20) Thailand, (21) Indonesia, (22) Malaysia, (23) India, (24) Australia, and (25) Papua New Guinea. Excluded from the class are 30 cases to be selected from cases currently pending in Brazoria, Dallas, Galveston, Jim Hogg and Morris counties in Texas.

Cause No. 93-2290, *Jorge Colindres Carcamo et al v. Shell Oil Co., et al,* in the 23rdDistrict Court of Brazoria County, Texas.

123.    This class action was continually pending from August 31, 1993 until the 23rd Judicial District Court of Brazoria County, Texas denied Plaintiffs' Motion for Class Certification on June 3, 2010. See *Carcamo, et al., v Shell Oil Company, et al.,* Memorandum Opinion and Order (Doc. # 10) at pg. 5; In United States District Court for the Southern District of Texas CA No. G-09-258, attached as **EXHIBIT A.** The filing of this class action tolls the running of limitations on Plaintiffs' claims against all Defendants in this lawsuit until the Texas Court denied Plaintiffs' motion for class certification on June 3, 2010.  Order denying class certification is attached as **EXHIBIT B.**

124.    None of the Plaintiffs discovered that their injuries were due to their DBCP exposure prior to the filing of the Texas class action August 31, 1993.  Accordingly, the *Carcamo* class action filed in 1993 for which Plaintiffs were putative class members tolled limitations as to each Plaintiff who asserts causes of actions and claims for damages for their DBCP related injuries against all joint tortfeasors in this action until the *Carcamo* Court denied class certification on June 3, 2010.

## V.  CAUSES OF ACTION

125.    Plaintiffs, on information and belief, allege that AMVAC Chemical Corporation, Shell Oil Company, The Dow Chemical Company, and Occidental Chemical Corporation ("the

Manufacturer Defendants") performed many of the tortious acts described below individually or through their predecessors and/or alter ego/agent corporations.

126.    The Manufacturing Defendants' conduct ultimately had a direct and deleterious impact on the Plaintiffs' health and well-being in and around the banana plantations where the Plaintiffs sustained exposure to the Manufacturing Defendants' DBCP containing products.

127.    The Plaintiffs allege that their exposure to the specific Manufacturing Defendants' DBCP containing products occurred due to the Manufacturing Defendants' actions manufacturing, marketing, selling, and distributing, DBCP for use on the banana plantations owned, operated, or otherwise controlled by individual Grower Defendants, and as a result of these actions, Plaintiffs suffered serious and permanent injuries to their health and well-being including, but not limited to, severe injury to their reproductive capacities.

128.    In addition, some have experienced damage to their cornea affecting their vision, some have developed chronic skin conditions, some have developed chronic respiratory problems, some have suffered a compromised renal system, and all have been subjected to an increased risk of cancer that has caused an increased bona fide fear of developing cancer.

129.    Upon information and belief, each of the Manufacturing Defendants sold DBCP containing products to each of the Grower Defendants during the time periods specified for use on the banana plantations that each Grower Defendant owned, operated, or otherwise controlled in the Plaintiffs' countries.  The Plaintiff's sustained exposure to DBCP where they lived, worked, or were otherwise present on or around these plantations where the Grower Defendants used the Manufacturing Defendants' DBCP and which resulted in the Plaintiffs DBCP related injuries that form the basis of their claims asserted here.

## A.  **FOR A FIRST CAUSE OF ACTION - NEGLIGENCE**

130.    All relevant allegations and facts set forth in the preceding paragraphs of this complaint are re-alleged and incorporated by reference herein where applicable, including but not limited to part IV. A - Defendants.

131.    The Plaintiffs were diagnosed with infertility or other injuries and illnesses related to prior DBCP exposure. Plaintiffs allege that the Manufacturing Defendants Shell and Dow fraudulently concealed and/or minimized the risks to human health posed by exposure to DBCP which ultimately led to each Plaintiff's exposure to DBCP and resulting injuries.  Plaintiffs further allege that the Grower Defendants fraudulently concealed Plaintiffs' injuries, the causes of Plaintiffs' injuries, and the Plaintiffs' legal right to compensation.

132.    Each of the Manufacturing Defendants had a duty to exercise reasonable care in the manufacture, sale, distribution, and/or placement of DBCP into the stream of commerce and the Grower Defendants had a duty to exercise reasonable care in the distribution and use of DBCP on the banana plantations the Grower Defendants owned, operated, and /or otherwise controlled, including a duty to assure that the product did not cause persons to suffer from unreasonable, dangerous exposures that would cause adverse health effects such as those suffered by the Plaintiffs.    Each of the Manufacturing Defendants failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of DBCP that they placed into the stream of commerce in that the Manufacturing Defendants knew or should have known that their DBCP products created a high risk of unreasonable, dangerous adverse health effects, some of which are life-threatening.

133.    Each of the Grower Defendants failed to exercise ordinary care in the use of DBCP on the banana plantations they owned, operated, and/or otherwise controlled in that the Grower Defendants knew or should have known that the use of DBCP created a high risk of unreasonable, dangerous adverse health effects, some of which are life-threatening.

134.    The illnesses and disabilities of the Plaintiffs and the need for medical monitoring for the development of various DBCP related health conditions, including but not limited to cancer, are a direct and proximate result of the negligence of the above Manufacturing Defendants and Grower Defendants in that the Manufacturing Defendants produced, sold, distributed, or otherwise placed DBCP-containing materials into the stream of commerce and the Grower Defendants distributed and directed the use and application of DBCP by workers under their control, all of which resulted in the Plaintiffs' exposure to the DBCP which all the Defendants knew, or in the exercise of ordinary care ought to have known, would be deleterious and harmful to the Plaintiffs' health and well-being.  The Defendants were negligent and/or grossly negligent in one, some or all of the following respects, among others, which were a proximate cause, alone and in combination, of the Plaintiffs' illnesses, disabilities and damages:

a.    the Manufacturing Defendants marketed and supplied DBCP or DBCP-containing products in Plaintiffs' countries of residence from ports in the United States when the Manufacturing Defendants knew or reasonably should have known that the Plaintiffs would use the shipments of DBCP and that such use was substantially certain to cause the injuries of which Plaintiffs now complain. Further, the Grower Defendants  supplied, distributed, and directed the use of DBCP or DBCP-containing products when the Grower Defendants knew or reasonably should have known that the Plaintiffs who lived, worked, or were otherwise present on or near the plantations a Grower Defendant owned

operated, or otherwise controlled would sustain exposure to the DBCP used and that such exposure was substantially certain to cause the injuries of which Plaintiffs now complain;

b.       the Manufacturing Defendants and the Grower Defendants failed to adequately warn the Plaintiffs and the public of the dangerous characteristics of DBCP and the hazards of exposure to it, including its carcinogenic, mutagenic, and teratogenic potential as well as its potential to cause other adverse health effects; including but not limited to infertility, vision loss, liver and kidney damage, chronic skin conditions, and respiratory problems;

c.       the Manufacturing Defendants and the Grower Defendants failed to provide the Plaintiffs with adequate information in their native language as to what would be reasonably safe protective clothing and proper protective equipment and apparatuses, if in truth there were any, to protect the Plaintiffs from harm and disability from exposure to DBCP;

d.       the Manufacturing Defendants and the Grower Defendants failed to place adequate warnings in the Plaintiffs' native language on the containers of DBCP-containing materials to warn of the health hazards of coming into contact with DBCP;

e.       the Manufacturing Defendants and the Grower Defendants failed to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safety plan for a safe method of handling and applying DBCP;

f.       the Manufacturing Defendants and the Grower Defendants failed to adequately supervise and instruct the Plaintiffs in the safe and proper application of DBCP-containing products;

g.      the Manufacturing Defendants failed to utilize a substitute material for DBCP in the nematocide;

h.      the Manufacturing Defendants failed to test DBCP prior to releasing these products for sale to determine safe methods of handling;

i.      the Manufacturing Defendants and the Grower Defendants failed to reveal the results of tests conducted on DBCP to the Plaintiffs, public health and safety officials, or the public at large and concealed from the Plaintiffs information concerning the observed effects of the DBCP products in laboratory tests and on the Plaintiffs and their coworkers;

j.      the Grower Defendants failed to adequately monitor the health of the Plaintiffs and their coworkers exposed to the DBCP products even though the Grower Defendants knew or should have known that the exposure sustained by Plaintiffs would likely lead one or more of the adverse health effects  suffered by the Plaintiffs as previously alleged;

k.      the Manufacturing Defendants failed to use due care in designing and manufacturing DBCP so as to avoid the aforementioned risks to the Plaintiffs when DBCP was being used; and

l.      the Manufacturing Defendants and the Grower Defendants were otherwise careless, reckless, or negligent in the placement into the stream of commerce and the use of DBCP.

135.    Defendants negligently misrepresented the risk to human health posed by DBCP, breaching a duty to Plaintiffs as end users and bystanders to end use who Defendants reasonably knew or should have known would be present during use and would therefore sustain exposure to the dangerous chemical and their resulting injuries.

136.    The Plaintiffs incorporate by reference part IV.A. of this complaint in accordance with FRCP 10(c).

137.    The Plaintiffs further allege that Defendants are liable to the Plaintiffs individually and on the alternative liability theory, "alter ego," and/or successor liability theories as to each Defendant's predecessors-in-interest,  related entities,  subsidiaries, or other affiliates. The Plaintiffs allege that the agents, employees, managers, officers, superintendents, and/or servants of these Defendants and their affiliates carried out the acts and omissions described herein in the course of their employment for these named Defendants in the furtherance of a common corporate course or purpose driven by a motive for profit for which all the Defendants recklessly disregarded the consequences to Plaintiffs of repeated DBCP exposure.

## B.  <u>FOR A SECOND CAUSE OF ACTION - STRICT LIABILITY</u>

138.    Plaintiffs re-allege all relevant allegations in the preceding paragraphs and incorporate them by reference herein where applicable.

139.    Defendants Dow, Shell, Occidental, and AMVAC are manufacturers and/or suppliers of DBCP and collectively referred to as the "Manufacturing Defendants."  The DBCP manufactured and/or supplied or otherwise placed into the stream of commerce by the Manufacturing Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks to human health exceeded the benefits associated with the design or formulation.

140.    Alternatively, the DBCP manufactured and/or supplied by the Manufacturing Defendants was defective in design or formulation, in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous because it was more dangerous

than an ordinary user would expect, and unreasonably dangerous and more dangerous than other alternatives.

141.     The Manufacturing Defendants designed, manufactured, formulated, and/or distributed and subsequently placed into the stream of commerce the DBCP-containing products that the Plaintiffs used or were in the proximity of when handled and applied.  The products left the possession and control of the Manufacturing Defendants in a defective and unreasonably dangerous condition in the following respects:

a.      the Manufacturing Defendants' DBCP-containing products did not contain an adequate and timely warning in the Plaintiffs' language or otherwise regarding the serious health hazards associated with DBCP;

b.      the Manufacturing Defendants' DBCP-containing products did not contain an adequate and timely warning concerning safety precautions and the need for protective equipment when working with DBCP;

c.      the Manufacturing Defendants' DBCP-containing products were defectively designed in that they contained DBCP, although a substitute for this chemical was available at all times material to this litigation;

d.      the Manufacturing Defendants' DBCP-containing products were unreasonably dangerous per se;

e.      the substance of the warning on the labels was inadequate because the approval of the labels was based on false, fraudulent, and misleading information supplied to the regulatory agencies responsible for approving the labels with an intent to mislead these agencies; and

      f.     DBCP manufactured and/or supplied by any Defendant was defective due to inadequate post-marketing warning or instruction because after the Defendant knew or should have known of the risk of injury from DBCP, Defendant failed to provide adequate warnings or precautions to users or consumers of the DBCP products and, in fact, continued to promote the product for use.

142.    The named Defendants were engaged in the business of manufacturing and/or distributing such DBCP-containing products, and these products, without substantial change in their condition after they were sold, proximately caused Plaintiffs' damages by a characteristic of DBCP that rendered the product unreasonably dangerous because Plaintiffs' damages arose from a reasonably anticipated use of the product by the Plaintiff or another person or entity.

143.    The Plaintiffs were unaware of the dangerous properties of DBCP which rendered DBCP-containing products unreasonably unsafe for their intended use.  Moreover, Plaintiffs used the DBCP-containing products in a manner that was reasonably anticipated by all the Defendants.  Further, during the periods that the Plaintiffs sustained exposure to the DBCP products of the Defendants, the products were being utilized in the manner intended by each of the Defendants.

144.    The injuries and damages of the Plaintiffs are also due to the intentional malfeasance of Defendants and/or their subsidiaries and/or affiliates and are the direct and proximate result of these Defendants' volitional acts.  Each of these Defendants knew of the dangers to human health caused by exposure to the DBCP-containing products, yet knowingly, consciously and with substantial certainty of the consequences of their actions proximately caused the Plaintiffs' injuries in the following respects:

a.      Defendants knowingly concealed information concerning the observed health effects of DBCP or DBCP-containing products from the Plaintiffs, the United States and foreign governments, and the Plaintiffs' communities;

b.      The Manufacturing Defendants sold and distributed those DBCP products for use involving the Plaintiffs in which they reasonably knew the Plaintiffs would sustain exposure. The Grower Defendants knew of the hazards posed by DBCP-containing products, yet they intentionally exposed Plaintiffs to DBCP products in operations involving the Plaintiffs;

c.      All Defendants knew of the hazards to the Plaintiffs posed by DBCP-containing products and by the methods of application utilized, yet Defendants continued to promote and/or use these methods and/or allow others to continue to use these methods;

d.      All Defendants knew of the hazards to the Plaintiffs posed by DBCP-containing products, yet Defendants failed to provide adequate protective clothing and equipment to the Plaintiffs and/or to take steps to ensure the Plaintiffs were provided adequate protection;

e.      All Defendants knew of the hazards to the Plaintiffs posed by DBCP-containing products, yet Defendants did not instruct those who handled the product, including the Plaintiffs, in proper application techniques that would prevent exposure;

f.      The Manufacturing Defendants continued to sell and the Grower Defendants continued to purchase and use DBCP-containing products after the United States government suspended or banned their use and, therefore, after all Defendants were indisputably on notice of DBCP's dangerous properties; and

g.      All Defendants negligently misrepresented the efficacy of DBCP and the risks to human health, breaching a duty to Plaintiffs as end users and bystanders who Defendants

reasonably knew or should have known would be present during use and therefore exposed to the dangerous chemical.

145.    The Plaintiffs further allege that Defendants are liable to the Plaintiffs for continuing harm resulting from the following volitional acts of these Defendants:

a.    knowingly concealing from the Plaintiffs knowledge of the existence, nature and severity of their injuries; and

b.    knowingly failing to take steps to enable, alert or cause the Plaintiffs to seek medical treatment for their injuries.

## C. <u>FOR A THIRD CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY</u>

172.    Plaintiffs re-allege all relevant allegations in the preceding paragraphs and incorporate them by reference herein where applicable.   The Manufacturing Defendants impliedly warranted that their DBCP-containing products were of good and merchantable quality and fit for their intended use.   The Plaintiffs would show that they worked in and/or came into close proximity to the DBCP-containing products of the Manufacturing Defendants and the Manufacturing Defendants knew or ought to have reasonably anticipated this would occur.   The Manufacturing Defendants breached their implied warranty that their DBCP products were of good and merchantable quality and were fit for their particular intended use by causing the Plaintiffs' exposure to DBCP which was a proximate and producing cause of Plaintiffs' injuries.

## D. <u>FOR A FOURTH CAUSE OF ACTION – CONSPIRACY</u>

173.    Plaintiffs allege all relevant allegations in the preceding paragraphs and incorporate them by reference herein where applicable.

174.    Plaintiffs further allege that all the named Defendants and/or their predecessors in interest knowingly agreed, contrived, combined, confederated, and conspired among themselves

and with others to achieve a common, improper purpose: to conceal from regulatory agencies, the public, and Plaintiffs the harms to health that exposure to DBCP could cause and the important safe use information regarding DBCP.  Defendants thereby caused the Plaintiffs' injuries, illnesses, and diseases and deprived the Plaintiffs of the opportunity to make an informed, free choice as to whether to use the DBCP-containing products and to expose themselves to the dangers.    In the event the Court determines that another jurisdiction's law applies and such law recognizes a cause of action under this legal theory, Plaintiffs assert a cause of action under this legal theory at this time to place Defendants on notice of these allegations.

175.    Defendants committed the above-described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to Defendants' DBCP-containing products.  Each of the Defendants aided and abetted one or more of the other Defendants in committing the tortious acts that caused the Plaintiffs' injuries in that each participated and assisted one or more of the other Defendants in bringing about the conduct that was a proximate and/or producing cause of each Plaintiff's injuries and damages as previously and subsequently alleged.

176.    Plaintiffs allege, upon information and belief, that in 1961 the PGAH distributed to Dole and Del Monte a joint Dow-Shell report on the hazardous effects of DBCP.  Despite receiving actual knowledge of the risks DBCP posed to a person's fertility, neither Dole nor Del Monte took any steps to distribute the information contained in the report to their workers or the public nor did any of the Defendants inform any of the Plaintiffs using DBCP of the risks that exposure posed to their health.  Exercising conscious disregard for the risk to persons exposed to DBCP, Dole and Del Monte promoted the development and use of DBCP by approving the

PGAH to license the patent to Defendants Dow and Shell, who jointly brought the products to market.

177.   Occidental formulated DBCP products for Dow in Occidental's Lathrop, California chemical plant which Dow rebranded as Fumazone and sold to the Grower Defendants.

178.   Dow licensed an interest in its patent rights to AMVAC to manufacture and/or sell DBCP to customers including the Grower Defendants.

179.   As previously alleged and incorporated by reference here as if fully set forth, Dow and Shell consciously suppressed information about the health risks of DBCP and designed arguments and crafted language to minimize the risks that use of DBCP posed to exposed persons.   The success of these efforts is evidenced by the fact that neither Dow, Shell, Occidental, nor AMVAC included the information about the health risks these Defendants knew about or should have known about that were in technical data sheets (the forerunners to today's material safety data sheets, or MSDSs) for the DBCP containing products they placed into the stream of commerce,

180.   These overt acts and omissions by Dow, Shell, Occidental, AMVAC, Dole, and Del Monte combined with the other acts delineated below to mislead and misinform regulatory agencies, the public, and Plaintiffs about the risks they faced from exposure to DBCP. In furtherance of these conspiracies and participation and assistance, Defendants performed the following overt acts, among others:

a.   All Defendants, individually, jointly and in conspiracy with each other, possessed medical and scientific data, and test reports which clearly indicated that DBCP-containing

products were unreasonably dangerous, hazardous and deleterious to human health and well-being, and carcinogenic, mutagenic, teratogenic, and potentially deadly;

b. despite medical and scientific data, literature and test reports possessed by or available to all Defendants, all Defendants individually, jointly, and in conspiracy with each other, fraudulently, willfully, and maliciously: and

(1) withheld, concealed, and suppressed the medical and scientific data, literature, and test reports regarding the risks of DBCP-containing products from the workers who were exposed to them and using them, the public, and the agricultural community;

(2) caused to be released, published, and disseminated information and statements regarding the risks of DBCP-containing products which Defendants knew were incorrect, incomplete, and misleading; and

(3) distorted the results of medical examinations conducted upon the Plaintiffs who were using DBCP-containing products and being exposed to the products by falsely stating and/or concealing the nature and extent of the harm, which the Plaintiffs, or workers such as the Plaintiffs, had suffered.

c. By the false and fraudulent representations, omissions, and concealments set forth above, the Defendants individually, jointly, and in conspiracy with each other, intended to induce the Plaintiffs to rely upon those false and fraudulent representations, omissions, and concealments and to continue to expose themselves to the dangers inherent in the use of and exposure to Defendants' DBCP-containing products and the lack of warnings and safe use guidelines that lead all the Plaintiffs to believe DBCP was safe to use and be around. The Plaintiffs and others reasonably and in good faith relied upon the false and fraudulent

representations, omissions, and concealments made by the Defendants regarding the nature of the DBCP-containing products.

181.    As a direct and proximate result of the Plaintiffs' reliance on the Defendants' false and fraudulent representations, omissions, and concealments, the Plaintiffs have sustained damages and injuries as described herein.

### E.   FOR A FIFTH CAUSE OF ACTION- PARTICIPATION AND ASSISTANCE

182.    Plaintiffs allege all relevant allegations in the preceding paragraphs and incorporate them by reference herein where applicable.

183.    Upon information and belief, Shell's conduct, including but not limited to the conduct set forth above, constituted assistance to and participation with Dow, Occidental, AMVAC, the Dole Defendants, the Chiquita Defendants, and Del Monte in causing the Plaintiffs' exposure to DBCP that was a proximate cause of each Plaintiff's injuries. Shell failed to provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP and failed to provide adequate safe use guidelines for handling DBCP that would protect those exposed from suffering DBCP exposure related injuries, illnesses, and adverse health conditions.  Plaintiffs also plead Participation and Assistance in the alternative because upon information and belief, certain Defendants will seek the application of Law other than the Law of  this jurisdiction.  In the event the Court determines that another jurisdiction's law applies and such law recognizes a cause of action under this legal theory, Plaintiffs assert a cause of action under this legal theory at this time to place Defendants on notice of these allegations.

184.    Upon information and belief, Dow's conduct, including but not limited to the conduct set forth above, constituted assistance to and participation with Shell, Occidental,

AMVAC, the Dole Defendants, the Chiquita Defendants, and Del Monte in causing the Plaintiffs' exposure to DBCP that was a proximate cause of each Plaintiff's DBCP related injuries. Dow failed to provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP and failed to provide adequate safe use guidelines for handling DBCP that would protect those exposed from suffering DBCP exposure related injuries, illnesses, and adverse health conditions.

185.    Upon information and belief, Occidental's conduct in formulating DBCP for Dow that Dow rebranded as Fumazone, in manufacturing and marketing DBCP under its own label DBCP 12 and selling and distributing it for use on bananas in Panama, Costa Rica, and Ecuador constituted assistance to and participation with Shell, Dow, AMVAC, the Dole Defendants, the Chiquita Defendants, and Del Monte in causing the Plaintiffs' exposure to DBCP that was a proximate cause of their injuries, in failing to provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP and in failing to provide adequate safe use guidelines for handling DBCP that would protect those exposed from suffering DBCP exposure related injuries, illnesses, and adverse health conditions.

186.    Upon information and belief, AMVAC's conduct, including but not limited to the conduct set forth above, constituted assistance to and participation with Shell, Dow, Occidental, the Dole Defendants, the Chiquita Defendants, and Del Monte in causing the Plaintiffs' exposure to DBCP that occurred from 1978 and thereafter that was a proximate cause of their injuries in that AMVAC continued to sell and distribute DBCP to the Grower Defendants while consciously disregarding the risks posed to human health from exposure to DBCP; in that AMVAC failed to provide adequate warnings to the Plaintiffs about the dangers to human health and well-being from exposure to DBCP and failed to provide adequate safe use guidelines in the Plaintiff's

native language for handling DBCP that would protect those exposed from suffering DBCP exposure related injuries, illnesses and adverse health conditions.

187.    Standard Fruit Company, Standard Fruit and Steamship Company, Dole Food Company, Inc., Dole Fresh Fruit Company, Chiquita Brands, Inc., Chiquita Brands International, Inc., Maritrop Trading Company, and Del Monte Fresh Produce, N.A. distributed and/or used nematocides containing the chemical dibromo chloropropane, commonly known as DBCP, including those sold under the trade names Fumazone, Nemagon, DBCP 12, and simply DBCP or derivations thereof on the banana plantations they owned, operated, or otherwise controlled where the Plaintiffs lived,  worked ,or were otherwise present in Costa Rica, Panama, or Ecuador, resulting in Plaintiffs' exposure to DBCP and subsequent adverse health effects and injuries.  These actions constituted assistance to and participation with each other and the Manufacturing Defendants in causing the Plaintiffs' exposure to DBCP that was a proximate cause of Plaintiffs' injuries.

### F.  FOR A SIXTH CAUSE OF ACTION-MEDICAL MONITORING

188.    Plaintiffs re-allege all relevant allegations in the preceding paragraphs and incorporate them by reference herein where applicable.

189.    The Plaintiffs seek the costs of medical monitoring for early detection of the risk of health related injuries and illnesses from their exposure to DBCP.

### G.  FOR A SEVENTH CAUSE OF ACTION – ENHANCED RISK OF INJURY FROM EXPOSURE TO DBCP

191.    Plaintiffs allege all relevant allegation in the preceding paragraphs and incorporate them by reference herein where applicable.

192.    There is a reasonable medical probability that Plaintiffs will suffer various future  medical conditions, including but not limited to cancer, diminished vision, and physical

problems from a compromised renal system due to DBCP exposure as a result Defendants' actions.

## VI.        DAMAGES

### A.        COMPENSATORY DAMAGES

191.    As a direct and proximate result of Defendants' tortious conduct, the Plaintiffs sustained damage to their fertility and reproductive capacities, or have developed sexual and reproductive abnormalities, and/or are subject to an increased risk of cancer and other related DBCP health conditions, including but not limited to cornea damage, chronic skin irritations, and renal problems, and have been damaged in some or all of the following particulars for which they have brought this action.

192.    Plaintiffs sustained physical and emotional injuries and  an increased risk of developing various medical conditions, including but not limited to an increased risk of cancer and a fear of cancer proximately caused by a characteristic of DBCP that renders the product unreasonably dangerous because Plaintiffs' damages arose from a reasonably anticipated use of the product by the Plaintiff or another person or entity to control nematocides on commercial banana plantations.

193.    The Plaintiffs' injuries were a direct and legal result of the negligence, gross negligence, recklessness, carelessness, other wrongdoing and/or action(s) of Defendants described herein:

a.       Defendants' conduct, as previously alleged, caused Plaintiffs' injuries in health, strength, and activity and caused them to suffer injuries to body and mind.  All of these injuries have caused Plaintiffs' past, present, and future injuries and damages.  The Plaintiffs suffer from one or more of the following adverse medical conditions as previous alleged:

compromised reproductive capacities, shrunken testicles, eye damage, compromised renal system, physical impairment, anxiety, distress, fear of developing cancer, pain, suffering, mental anguish, and distress secondary to the injury and damages. Plaintiffs have suffered other injuries, the exact nature and extent of which are not fully known at this time;

   b. Plaintiffs require reasonable and necessary health care, attention and services and have incurred medical, health, incidental and related expenses.  Plaintiffs are informed and believe, and therefore allege, they will in the future be required to obtain medical and/or hospital care, attention, and services in amounts that are as yet undetermined;

   c. the Plaintiffs have suffered great physical pain and suffering, mental anguish, and emotional distress and will continue to suffer great pain of body and mind throughout their lives; and

   d. the Plaintiffs have suffered an extraordinarily increased risk of developing serious illness, including leukemia, cancer of the testes, kidneys, liver and gastrointestinal tract, and other types of cancer.  To detect the early onset of such diseases, the Plaintiffs will incur substantial expenses for medical testing, evaluation, examination, and other related expenses or may have to forego such medical care due to a lack of resources.  These medical monitoring expenses are solely necessary because the Defendants wrongfully exposed the Plaintiffs to DBCP-containing products.  The Plaintiffs' need for liquidated damages for the costs of future medical expenses is reasonable in light of the following:

   (1) the Plaintiffs have suffered significant exposure to Defendants' DBCP-containing products;

(2)    DBCP-containing products are so toxic and hazardous to human health that the U.S. government and most other developed and developing countries have banned their use;

(3)    diseases caused by DBCP-containing products are serious and can be fatal;

(4)    Plaintiffs have a significantly increased risk for developing such diseases; and

(5)    early detection and diagnosis of diseases caused by DBCP-containing products will improve the prospects for cure, treatment, and minimization of pain and disability.

e.    the Plaintiffs have suffered an extraordinarily increased risk of genetic damage as a result of their exposure to Defendants' DBCP-containing products;

f.    the Plaintiffs have lost capacity to enjoy life and will continue to suffer such loss in the future due to their exposure to Defendants' products; and

g.    the Plaintiffs seek damages for medical monitoring and/or surveillance.

194.    The Plaintiffs have a substantially increased fear of developing cancer due to their exposure to DBCP containing products.

195.    The Plaintiffs claim damages that exceed the minimal jurisdictional amount required by this Court.

**B.    PUNITIVE DAMAGES**

196.    Plaintiffs re-allege all relevant allegations contained in the previous paragraphs and incorporate them by reference herein where applicable.

197.    Defendants are liable for punitive damages for wanton and reckless disregard for public safety in the design, manufacture, marketing, sale, distribution, handling, storage, transportation, and use of DBCP.  Upon information and belief, the Manufacturing Defendants continued to sell DBCP and the Grower Defendants continued to require DBCP to be used on the banana plantations each owned, operated, and/or controlled through 1985. Plaintiffs assert claims for punitive damages or exemplary damages to the extent allowed by applicable law.

198.    Defendants' wanton and reckless conduct contributed to Plaintiffs' exposure to DBCP through continued contamination of air the Plaintiffs breathed, water the Plaintiffs consumed and bathed, in and the soil in which the Plaintiffs worked or to which they were otherwise exposed.

199.    As a direct and proximate result of all the Defendants' breach of duties to the Plaintiffs as delineated above, the Plaintiffs have sustained the DBCP-related injuries, diseases, illnesses, and/or conditions set forth above, along with pain and suffering, the undergoing of medical treatment and continued need for medical treatment, medical expenses, past, present, and future disability and diminution of quality and enjoyment of life, including the mental anguish, fear, and emotional distress associated with the knowledge there is no cure for these diseases or illnesses.

200.    The Plaintiffs have also suffered substantial damages in the form of mental anguish, emotional distress, humiliation, and social ostracism because they are unable to have children which violates the cultural norms of their society.

201.    The Plaintiffs will show that the Defendants, their agents, servants, employees, managers, superintendents, supervisors, and officers directly and proximately caused the damages incurred by Plaintiffs by the reckless and grossly negligent acts and omissions,

conscious indifference and other disregard for the health and welfare of the Plaintiffs on the part of the named Defendants. Defendants ignored and concealed evidence available to them that demonstrated that DBCP and DBCP-containing materials were harmful and deadly to persons coming into contact with such materials.

202.    Defendants committed the acts and omissions described above maliciously, intentionally, and with flagrant disregard for the rights of the Plaintiffs and others, and with the actual awareness that the acts and omissions would, with reasonable probability, result in great physical and emotional harm to the Plaintiffs.   Consequently, users of DBCP-containing products, such as the Plaintiffs, were deprived of the opportunity of free choice as to whether or not to expose themselves to DBCP-containing products manufactured, formulated and used by the Defendants.

203.    The Plaintiffs will show that as a result of the aforesaid conduct, they should be awarded an amount that would punish the Defendants and act as a deterrent to Defendants for the commission of similar wrongs.

204.    The Plaintiffs claim damages including compensatory damages, punitive damages, and other damages, if any, that exceed the minimal jurisdictional amount required for jurisdiction by this Court exclusive of interest and costs.

## VII.    PRAYER

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for general and special damages and for exemplary damages, for their costs expended, for interest on the judgment from the date rendered until paid, at the legal rate, for prejudgment interest, and for other such other and further relief both at law and at equity to which the Plaintiffs may show themselves justly entitled.

The Plaintiffs pray for relief as follows:

1.      For general damages in a sum in excess of the jurisdictional minimum of this Court;

2.      Medical, incidental, hospital, and service expenses according to proof;

3.      Emotional distress/mental anguish damages according to proof;

4.      Liquidated damages to compensate for the costs of future medical monitoring expenses according to proof;

5.      Damages for enhanced risk of injury from exposure to DBCP;

6.      Prejudgment and post-judgment interest as provided by law;

7.      Compensatory damages in excess of the jurisdictional minimum of the Court, according to proof;

8.      Consequential damages in excess of the jurisdictional minimum of the Court, according to proof;

9.      Punitive and exemplary damages;

10.     Attorneys' fees, expenses, and costs of this action;

11.     Plaintiffs pray for medical monitoring damages; and

12.     Such further relief as this Court deems necessary, just, and proper.

                                        **PERRY & SENSOR**

                                        By: /s/ Michael L. Sensor
                                             Michael L. Sensor, Esquire
                                             Delaware Bar ID No.  3541
                                             One Customs House, Suite 560
                                             P.O. Box 1568
                                             Wilmington, DE 19899-1568
                                             Telephone: (302) 655-4482
                                             Facsimile: (302) 655-4043
                                             Attorney for Plaintiffs

Dated: May 31, 2012