IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: DBCP LITIGATION,<br><br>(Ecuadorian Plaintiffs), | Civil Action No. 12-695-RGA |

MEMORANDUM ORDER

Before me are four *Daubert* motions: three filed by Defendants (D.I. 768, 770, 800) and one filed by Plaintiffs (D.I. 784). The motions are fully briefed. (D.I. 769, 848, 894 (Dr. Frank); D.I. 771, 840; 895 (Dr. Dydek); D.I. 801, 868, 913 (Dr. Freeman); D.I. 784, 830; 901 (Mr. Washburn)). I reviewed the briefing and, on that basis, resolved some of the disputed issues about these experts' opinions. (D.I. 956). Plaintiffs filed a Rule 60 Motion for Relief from Order and for Reconsideration on Dr. Dydek's opinions (D.I. 972), which is fully briefed as well (D.I. 972, 988).[1] I held *Daubert* hearings for these expert witnesses, among others, from June 15, 2026, to June 18, 2026. (Min. Entries June 15, 2026, to June 18, 2026; D.I. 948, 956, 967, 968 (orders on *Daubert* hearing witnesses and scheduling); D.I. 1029, 1024, 1025, 1027 (transcripts)[2]). For the reasons below, the motion to exclude Dr. Frank's testimony is DENIED, the motion to exclude Dr. Dydek's testimony is GRANTED IN PART and DENIED IN PART, and the motion for reconsideration is DENIED; the motion to exclude Dr. Freeman's testimony is GRANTED IN

---

1 I treat this as a motion for reargument under Rule 54(b) rather than a motion under Rule 60(b). The latter applies only to final judgments, whereas the former applies to interlocutory orders, such as decisions on Rule 702 motions. The Local Rules do not permit reply briefs for motions for reargument unless specifically granted by the court. D. Del. LR 7.1.5(a). I denied the stipulation to file a reply brief. (D.I. 995 (denying D.I. 993)).

2 The chronological order of the *Daubert* hearing transcripts is not reflected by the assigned docket numbers.

PART and DENIED IN PART; and the motion to exclude Mr. Washburn's testimony is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

Plaintiffs are Ecuadorian citizens who allege that Defendants' use of the pesticide dibromochloropropane (DBCP) on the banana farms where Plaintiffs worked caused Plaintiffs to suffer infertility and sterility. This litigation has a voluminous procedural history, which has been recounted elsewhere. *Aguilar Marquínez v. Dole Food Co.*, 2020 WL 10895709, at *1 (D. Del. Sept. 18, 2020) (citing *Blanco v. AMVAC Chem. Corp.*, 2012 WL 3194412, at *1–5 (Del. Super. Ct. Aug. 8, 2012); *Chavez v. Dole Food Co.*, 836 F.3d 205, 211–15 (3d Cir. 2016)).

The motions here pertain to the parties' expert opinions on the Trial Group 1 plaintiffs, or the "Dole Applicators." (D.I. 488; *see* D.I. 473, 474). As of now, Trial Group 1 has four members: Primitivo Apolinario Eugenio Villon (Mr. Eugenio Villon), Jose Santiago Loja Alvarado (Mr. Loja Alvarado), Milton Medardo Maza Vivanco (Mr. Maza Vivanco), and Nicanor Virgilio Rosario Avelino (Mr. Rosario Avelino).[3] I scheduled hearings for the week of June 15, 2026, to address the *Daubert* motions related to Trial Group 1. (D.I. 937, 948). Before and during the hearings, I ruled on some of these motions. (D.I. 953, 956, 987, 990, 991). The remaining motions pertain to Dr. Frank, Dr. Dydek, Dr. Freeman, and Mr. Washburn.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

[3] I use the same naming convention here that I used in my previous order on *Daubert* motions. (D.I. 956 at 1).

> facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[4]

## III. DISCUSSION

I address each contested expert's testimony in turn. I first discuss Plaintiffs' experts, then Defendants' expert.

---

[4] The Court of Appeals wrote under an earlier version of Rule 702. Subsequent amendments affect the substance of the rule, but I do not think they alter the applicability of the quoted discussion.

**A. Dr. Frank**

Plaintiffs' expert Arthur L. Frank is an occupational medicine physician offering testimony on whether the Dole Applicators' DBCP exposure caused their infertility issues. (D.I. 1025 at 42:19–43:18, 43:22–44:1). "He wrote four two-page reports, one for each plaintiff," in which he concludes, "to a reasonable degree of medical probability," that DBCP exposure caused the Dole Applicators' reproductive issues. (D.I. 956 at 3; *see* D.I. 769-1 Ex. C; D.I. 769-1 Ex. E; D.I. 769-1 Ex. F, D.I. 769-1 Ex. G (Frank reports)).

Defendants move to exclude Dr. Frank's testimony. (D.I. 768). They argue that he wrongly assumes that the occurrence of infertility after DBCP exposure means the exposure caused infertility (D.I. 769 at 1, 7–9; D.I. 894 at 1, 5–6); he provides no dose threshold or studies to support his causation opinion (D.I. 769 at 2, 9–12; D.I. 894 at 1–3); and he does not properly conduct a differential diagnosis or follow any other scientifically based methodology (D.I. 769 at 12–13; D.I. 894 at 1, 3–5). Plaintiffs contend that Dr. Frank applies "well-accepted occupational-medicine principles" to each Trial Group 1 plaintiff's detailed medical history, records, and recollections in forming his opinions. (D.I. 848 at 1, 3–6, 7–8).

Because I found that "[t]he reports themselves offer 'little insight' into how [Dr. Frank] reached his conclusion" (D.I. 956 at 4), I asked that during the hearings, Dr. Frank provide the following information: (1) a description of what scientific or medical methodology he uses, (2) the background risk of oligospermia (reduced sperm count) and azoospermia (zero sperm count), and (3) the harmful level of exposure to DBCP and how that compares to Trial Group 1 plaintiffs' actual exposure (*id.* at 5). I stated, "I would like to follow the law about differential diagnosis" as set forth in *Kannankeril v. Terminix International, Inc.*, 128 F.3d 802, 807–08 (3d Cir. 1997). (D.I. 956 at 6 (citing *id.* at 4 n.4)).

Dr. Frank testified at a *Daubert* hearing on June 15, 2026. (Min. Entry June 15, 2026; *see* D.I. 1029). He answered my questions. Dr. Frank explained that he performed differential diagnoses of the Trial Group 1 plaintiffs, relying on their medical records and histories, to determine the causes of their infertility issues. (D.I. 1029 at 49:19–50:17, 57:9–63:3); *see also Kannankeril*, 128 F.3d at 807–08 (recognizing differential diagnosis "as a technique that involves assessing causation with respect to a particular individual"). He explained how the scientific literature shows that DBCP exposure can cause male reproductive harm. (D.I. 1029 at 44:5–45:20, 46:8–25). Dr. Frank provided background risk estimates of about 10% for oligospermia and about 1–2% for azoospermia (*id.* at 45:21–46:7; 73:8–17) and pointed to literature showing that workers exposed to DBCP experienced oligospermia and azoospermia at higher rates (*id.* at 46:8–20). As for DBCP dose thresholds, Dr. Frank stated that he does not know the "absolute lowest level" "associated with reproductive injury" (*id.* at 52:7–21), but he opined that OSHA's occupational exposure limit for DBCP of 1 part per billion was "not necessarily safe" (*id.* at 53:16–25, 56:10–57:4). He asserted that based on the Dole Applicators' work conditions and testimony, they were exposed to much higher levels of at least 10 parts per billion (*id.* at 54:8–57:4).

I credit Dr. Frank's testimony. I determine that his opinions—that DBCP exposure affected the plaintiffs' fertility—are products of accepted occupational medical methods, reliably applied to the facts at hand. I think his testimony sufficiently addresses Defendants' *Daubert* challenges. Dr. Frank provided reliable bases for DBCP's general causation of reproductive injury, estimates of dose thresholds and actual doses received, and his findings of specific causation (differential diagnoses). I thus deny the motion to exclude Dr. Frank's testimony.

**B. Dr. Dydek**

S. Thomas Dydek is Plaintiffs' expert toxicologist.[5] (D.I. 948 at 2 (citing D.I. 771 at 1)). In his report (D.I. 771-1 Ex. B), he provides estimates of hours of exposure to DBCP for Mr. Maza Vivanco, Mr. Eugenio Villon, and Mr. Rosario Avelino, but not Mr. Loja Alvarado (*id.* at 7).[6] He says, "It is probable that the exposures these four Plaintiffs had while applying DBCP by injection in banana plantations were the cause of their adverse reproductive conditions." (*Id.* at 9).

Defendants move to exclude Dr. Dydek's testimony (D.I. 770) because he does not apply his own methodology to Mr. Loja Alvarado (D.I. 771 at 9–10; D.I. 895 at 2–3), and he does not show that the Dole Applicators experienced DBCP exposure sufficient to cause reproductive harm (D.I. 771 at 10–17; *see id.* at 10–13 (challenging the dose thresholds used as benchmarks); *id.* at 14–17 (criticizing his general causation opinion as unsupported by scientific literature); D.I. 895 at 3–7). Plaintiffs do not respond to Defendants' argument on Mr. Loja Alvarado, but they respond to Defendants' other arguments, characterizing them as disputes of fact rather than of methodology. (D.I. 956 at 3; *see generally* D.I. 840).

In my pre-hearing order, I excluded Dr. Dydek's opinion on Mr. Loja Alvarado because Plaintiffs, by not responding, waived their opposition to this argument. (D.I. 956 at 3). I held that Dr. Dydek may not offer a "proximate cause" or specific causation opinion because under Delaware law, he is not qualified to provide expert medical testimony. (*Id.* at 3, 7–8 (citing *Money v. Manville Corp. Asbestos Disease Comp. Tr. Fund*, 596 A.2d 1372, 1377 (Del. 1991))). I remarked that Dr. Dydek appears to agree with Defendants that "regulatory standards do not

---

5 Dr. Dydek also has expertise in environmental engineering. (D.I. 948 at 2 n.2).

6 Dr. Dydek estimates that Mr. Maza Vivanco's total hours of exposure are 6,552 hours, Mr. Eugenio Villon's are 2,340 hours, and Mr. Rosario Avelino's are 240 hours. (D.I. 771-1 Ex. B at 7). Dr. Dydek said that he could not calculate Mr. Loja Alvarado's total hours of exposure because Mr. Loja Alvarado did not remember how often he performed DBCP injections. (*Id.*).

establish a level of exposure that is harmful." (*Id.* at 3 (citing D.I. 842 ¶¶ 10–11); *see* D.I. 771 at 12–13; D.I. 895 at 6–7). Nonetheless, I said, "I think Dr. Dydek's opinion about the exposure experience of the three Plaintiffs for whom he has an opinion logically follows from his inputs." (D.I. 956 at 3). I asked Dr. Dydek, at the hearing, to address "whether he has an opinion based on the literature reviews as to how much DBCP exposure experience is required to have adverse effects on male reproductive function." (*Id.*).

On May 15, 2026, Plaintiffs sent me a letter disputing my determination that they did not counter Defendants' argument on Mr. Loja Alvarado. (D.I. 966 at 2). I rejected this contention. (D.I. 968 at 2). Plaintiffs filed a late Rule 60 Motion for Relief from Order and for Reconsideration of my decision to exclude Dr. Dydek's causation opinions on Mr. Loja Alvarado.[7] (D.I. 972). Defendants responded. (D.I. 988). Plaintiffs sought a stipulation to file a reply brief (D.I. 993), which I denied (D.I. 995).

Dr. Dydek testified before me on June 17, 2026. (Min. Entry June 17, 2026; *see* D.I. 1025). He discussed his review of the scientific literature on DBCP and its effects on human health, specifically that DBCP exposure leads to decreased sperm counts, and greater exposure leads to a larger reduction in sperm counts. (D.I. 1025 at 5:10–16:8). He opined that significant decreases in sperm counts occurred at around 300 to 400 hours of DBCP exposure. (*Id.* at 16:9–18, 21:23–22:18). Plaintiffs confirmed that Dr. Dydek would only offer opinions on specific plaintiffs as to "how many hours they were exposed" to DBCP, not on specific causation. (*Id.* at 27:8–17). I

[7] D. Del. LR 7.1.5 provides that motions for reargument "must be filed within 14 days after the Court issues its opinion." I issued my opinion on April 30, 2026 (D.I. 956), and this motion was filed on June 9, 2026 (D.I. 972), well after the deadline. D. Del. LR 7.1.5 provides that these motions "not exceed 10 pages." Plaintiffs' motion is 14 pages. (D.I. 972).

asked the parties to provide the studies and papers Dr. Dydek used. (*Id.* at 59:5–61:8). These materials are on the docket. (*See* D.I. 998).

I address the active disputes on Dr. Dydek's expert testimony: (1) his exposure opinion on Mr. Loja Alvarado and (2) whether the remaining Trial Group 1 plaintiffs experienced DBCP exposure sufficient to cause reproductive harm.

**1. Exposure opinion on Mr. Loja Alvarado**

I determined that Plaintiffs, in not addressing Dr. Dydek's Loja Alvarado exposure opinion in their opposition brief, waived their argument on this matter. (D.I. 956 at 3). Plaintiffs contend that I erred in finding waiver (D.I. 966 at 2; D.I. 972 at 7–9) and that I must admit this opinion in accordance with my gatekeeper function and the preference for resolutions on the merits (D.I. 972 at 9–14 (citing *Sikkelee v. Precision Airmotive Corp.*, 522 F. Supp. 3d 120, 153 (M.D. Pa. 2021) (gatekeeper function) and *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) (resolutions on the merits))).

I reject these arguments. Plaintiffs point to sections I.a and I.b of their opposition brief as responsive to Defendants' challenge. (D.I. 966 at 2 (citing D.I. 45); D.I. 972 at 7–8 (citing D.I. 840 at 4–6)). This cited portion, however, only states that Dr. Dydek followed a reliable methodology and that he may rely on another expert witness's opinions. (D.I. 840 at 4–6). Nowhere in the opposition brief do Plaintiffs address Defendants' argument that Dr. Dydek did not follow his own methodology of calculating DBCP exposure for Mr. Loja Alvarado. (*See* D.I. 771 at 6–7). I see no error in my finding of waiver.

Plaintiffs misconstrue my gatekeeper function. My purpose as a gatekeeper is to "prevent[] opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Schneider*, 320 F.3d at 404. In *Sikkelee*, the court allowed the parties to file

late *Daubert* motions to ensure that the jury did not hear "potentially unfounded expert opinions." 522 F. Supp. 3d at 153. The burden of proof for admissibility of expert testimony falls upon the party that seeks to introduce the evidence. *Id.* at 155 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000)). Plaintiffs bear the burden of showing that Dr. Dydek's opinion on Mr. Loja Alvarado is admissible, and they do not meet that burden. My decision to exclude this opinion due to waiver is not a procedural technicality preventing a resolution on the merits. It is a consequence of Plaintiffs' failure to sustain a case for admission.

**2. DBCP exposure sufficient to cause reproductive harm**

After hearing Dr. Dydek (*see* D.I. 1025) and considering the quantity of literature he reviewed and referenced (*see* D.I. 998),[8] I credit his testimony. I think Dr. Dydek's opinion of

---

[8] Dr. Dydek provided thirteen studies and documents on DBCP's effects on male reproductive function. (D.I. 998-1 Ex. A, SPECIAL PESTICIDE REV. DIV., U.S. ENV'T PROT. AGENCY, DIBROMOCHLOROPROPANE (DBCP): FINAL POSITION DOCUMENT (1978); D.I. 998-2 Ex. B, R. I. Glass et al., *Sperm Count Depression in Pesticide Applicators Exposed to Dibromochloropropane*, 109 AM. J. EPIDEMIOLOGY 346 (1979); D.I. 998-3 Ex. C, Larry I. Lipshultz et al., *Dibromochloropropane and its Effect on Testicular Function in Man*, 124 J. UROLOGY 464 (1980); D.I. 998-4 Ex. D, Enrique Márquez Mayaudón, *1, 2 dibromo-3-cloro-propano (DBCP) nematicida con acción esterilizante en el hombre*, 20 SALUD PÚBLICA DE MÉXICO 195 (1978); D.I. 998-5 Ex. E, G. Potashnik et al., *Effect of Dibromochloropropane on Human Testicular Function*, 15 ISR. J. MED. SCIS.438 (1979); D.I. 998-6 Ex. F, Ana L. Ramírez R. & Carlos M. Ramírez M., *Esterilidad masculina causada por la exposición laboral al nematicida l,2-Dibromo-3 Cloropropano*, 23 ACTA MÉDICA COSTARRICENSE 219 (1980); D.I. 998-7 Ex. G, S. H. Sandifer et al., *Spermatogenesis in Agricultural Workers Exposed to Dibromochloropropane (DBCP)*, 23 BULL. ENV'T CONTAMINATION & TOXICOLOGY 703 (1979); D.I. 998-8 Ex. H, Morley Slutsky et al., *Azoospermia and Oligospermia among a Large Cohort of DBCP Applicators in 12 Countries*, 5 INT'L J. OCCUPATIONAL & ENV'T HEALTH 116 (1999); D.I. 998-9 Ex. I, Lori Ann Thrupp, *Sterilization of Workers from Pesticide Exposure: The Causes and Consequences of DBCP-Induced Damage in Costa Rica and Beyond*, 21 INT'L J. HEALTH SERVS. 731 (1991); D.I. 998-10 Ex. J, M. Donald Whorton & Donna E. Foliart, *Mutagenicity, carcinogenicity and reproductive effects of dibromochloropropane (DBCP)*, 123 MUTATION RSCH. 13 (1983); D.I. 998-11 Ex. K, Donald Whorton et al., *Infertility in Male Pesticide Workers*, 310 LANCET 1259 (1977); D.I. 998-12 Ex. L, T. R. Torkelson et al, *Toxicologic Investigations of 1,2-Dibromo-3- Chloropropane*, 3 TOXICOLOGY & APPLIED PHARMACOLOGY 545 (1961); D.I. 998-13 Ex. M, Dow Chem. Co., *Results of Repeated Exposure of Laboratory Animals to Various*

how much DBCP exposure is required (about 300 to 400 hours) to have adverse effects on male reproductive function (*e.g.*, reduced sperm count) is grounded in scientific literature and is reliable. His methodology and application of the methodology to Trial Group 1 plaintiffs (other than Mr. Loja Alvarado) is consistent and reliable. He used the Dole Applicators' testimony on their respective frequencies and time spans of applying pesticides to estimate each person's hours of exposure. Likewise, based on Trial Group 1 plaintiffs' testimony of the scent of DBCP and scientific literature on DBCP odor thresholds, Dr. Dydek calculated a floor for the DBCP exposure. I deny the motion to exclude Dr. Dydek's opinions on this matter.

**C. Dr. Freeman**

Michael Freeman is Plaintiffs' expert epidemiologist.[9] (D.I. 801 at 1; D.I. 868 at 1). He opines that there is a general causal relationship between DBCP exposure and male infertility in the agricultural setting. (D.I. 801 at 1). These conclusions are based on Dr. Freeman's literature review on the reproductive effects of DBCP exposure in manufacturing settings and his analysis of data from Dole's 1990s settlement program in Costa Rica and Honduras (Dole Settlement Data). (*Id.*). He opines that there is specific causation as to Mr. Eugenio Villon, Mr. Loja Alvarado, and Mr. Rosario Avelino, but he provides no such opinion on Mr. Maza Vivanco. (D.I. 956 at 6).

Defendants present three arguments for excluding Dr. Freeman's testimony: (1) the Dole Settlement Data is not a reliable basis for epidemiological analysis,[10] and his analysis of the data is unreliable (D.I. 801 at 9–16; D.I. 913 at 2–8); (2) his "distilled" Bradford-Hill methodology is

---

*Concentrations of 1,2-Dibromo-3-Chloropropane* (July 23, 1958)). Exhibits D and F are in Spanish, a language I cannot read.

[9] Dr. Freeman also has a medical degree, although he does not and, I believe, has not practiced medicine. (D.I. 801 at 2).

[10] Defendants make additional arguments about the Dole Settlement Data that do not, in my opinion, implicate *Daubert* concerns. (*See* D.I. 956 at 6 n.5).

unreliable (D.I. 801 at 16–19; D.I. 913 at 8–10); and (3) he cannot opine on specific causation (D.I. 801 at 19–20; D.I. 913 at 10). Plaintiffs challenge all three arguments. (*See* D.I. 868 at 4–16 (Dole Settlement Data analysis), *id.* at 16–18 (distilled Bradford-Hill methodology); *id.* at 18–19 (specific causation)).

Before the hearing, I ruled, "Dr. Freeman cannot give an opinion on specific causation" because he "does not have the qualifications to provide expert medical testimony." (D.I. 956 at 7–8 (citing *Money*, 596 A.2d at 1377 (explaining Delaware law on proximate cause); *Kannankeril*, 128 F.3d at 806 n.5 (holding that state law controls))).[11] I held, "Dr. Freeman can offer opinions on epidemiological issues not as evidence of causation of disease but as an aid to understanding and evaluating the medical opinion of the plaintiff's expert physician." (D.I. 956 at 7–8 (quoting *Lee v. A.C. & S. Co.*, 542 A.2d 352, 356 (Del. Super. 1987)) (cleaned up)). I asked the parties to address at the hearing whether the Dole Settlement Data and Dr. Freeman's analysis of this data are reliable.[12] (*Id.* at 7). Noting that Dr. Freeman relies on his own paper to show that his distilled

---

[11] Delaware law requires a trained physician to opine on specific causation. There is also authority that the expertise of epidemiologists does not include offering opinions on specific causation.

> Epidemiology is concerned with the incidence of disease in populations and does not address the question of the cause of an individual's disease. This question, sometimes referred to as specific causation, is beyond the domain of the science of epidemiology. Epidemiology has its limits at the point where an inference is made that the relationship between an agent and a disease is causal (general causation) and where the magnitude of excess risk attributed to the agent has been determined; that is, epidemiology addresses whether an agent can cause a disease, not whether an agent did cause a plaintiff's disease.

(D.I. 869-6 Ex. F, FED. JUD. CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 167 (3d ed. 2011) (footnotes omitted)).

[12] In particular, I did not understand why the data considered birth rates before and after 1978 specifically, and I did not know whether Dr. Freeman controlled for age in his analysis. (D.I. 956 at 7).

methodology is valid, I asked, "whether any scientist besides Dr. Freeman considers it to be a valid methodology, and has published papers in support of it." (*Id.*).

Dr. Freeman testified at a *Daubert* hearing on June 18, 2026. (Min. Entry June 18, 2026; *see* D.I. 1027). Dr. Freeman said that in the 1990s, "Dole workers were offered the ability to apply for this program and be tested if they qualified in order to receive some form of compensation." (D.I. 1027 at 13:3–6). The Dole Settlement Data includes indicators of participants' fertility (*e.g.*, sperm counts, testosterone levels, follicle-stimulating hormone levels, number of children born before and after 1978[13]) and how long participants had worked for Dole-affiliated farms. (*Id.* at 13:8–18). Among these participants, Dr. Freeman analyzes the subset of participants for whom he had sufficient medical information and lab results.[14] (*Id.* at 13:19–14:4). He compares the lab results of workers with one year or less of DBCP exposure to those with more than one year of exposure.[15] (*Id.* at 32:20–23). Dr. Freeman concludes that there is a general causal relationship between an increase in DBCP exposure and decreased sperm counts in the agricultural context. (*Id.* at 38:11–20).

Dr. Freeman explained how his Bradford-Hill methodology differs from the standard analysis and why this methodology is valid. "The standard Bradford-Hill analysis is a widely implemented nine-part epidemiological framework used to determine whether a causal relationship exists between a stimulus and symptomatic response." *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 850 (7th Cir. 2025), *cert. denied sub nom. Andrews v. Lands' End, Inc.*, No. 26-3,

---

13 The settlement program used 1978 as a comparison point with respect to birth rates. This was not a study design decision by Dr. Freeman. (D.I. 1027 at 34:12–35:21).

14 The lab tests were administered in the 1990s, when the program was operated, not during or immediately after times of DBCP exposure.

15 Dr. Freeman said that he "adjusted for the age of the individuals" to account for the fact that individuals who worked longer tended to be older. (D.I. 1027 at 33:9–12).

2026 WL 2976181 (U.S. Oct. 5, 2026) (citing FED. JUD. CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 599–600 (3d ed. 2011); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 n.4 (9th Cir. 2017)). A standard Bradford-Hill analysis considers nine viewpoints: "(1) plausibility; (2) strength of association; (3) consistency; (4) biological gradient (dose-response relationship); (5) specificity of the association; (6) analogy; (7) temporality; (8) experiment (cessation of exposure); and (9) coherence." *Id.* at 851 (citing Austin Bradford-Hill, *The Environment and Disease: Association or Causation?*, 58 PROC. ROYAL SOC'Y MED. 295, 295–99 (1965)). Dr. Freeman's distilled methodology differs in that he considers three factors—plausibility, temporality, and alternative causation—and treats the remaining factors as encapsulated by plausibility. (D.I. 1027 at 17:20–20:10). He provided a list of seven publications that use his three-step approach to the Bradford-Hill methodology and noted that they all "cite specifically to [his] publications on the topic."[16] (D.I. 1027 at 23:25–26:22).

After Dr. Freeman's testimony, Defendants had their own experts Dr. Steffey and Dr. Hernandez testify. (*See generally id.*). At the end of the hearing, I asked the parties to provide

---

[16] The seven publications are: (1) Mohamed Amine Boumelik et al., *Takotsubo Cardiomyopathy Following Physical Assault: A Medico-Legal Case Report*, 15 J. CHEM. HEALTH RISKS 117 (2025); (2) J. L. Schumann et al., *Forensic Epidemiology: Bridging Public Health and Legal Investigations to Address Modern Challenges*, 7 WILEY INTERDISC. REVS.: FORENSIC SCI. e70003 (2025); (3) Steven P. Brown, *Plausible Mechanisms of Causation of Immediate Stroke by Cervical Spine Manipulation: A Narrative Review*, 16 CUREUS e56565 (2024); (4), M. Indelicato et al., *Homicidal or suicidal death? Evidence-based approach to assessing cause of death in a peculiar forensic case*, 175 LA CLINICA TERAPEUTICA 40 (2024); (5) Qingxin Yang et al., *A machine learning-based predictive model of causality in orthopaedic medical malpractice cases in China*, 19 PLoS ONE e0300662 (2024); (6) Nnabuike C. Ngene & Jagidesa Moodley, *COVID-19 death: A novel method of improving its identification when a patient has multiple diagnoses*, 37 S. AFR. J. INFECTIOUS DISEASES a349 (2022); and (7) Olle Bunketorp, *WAD – Criteria for Evaluation of Causality*, 1 OPEN J. TRAUMA 54 (2017).

reference materials on epidemiological principles and how they relate to Dr. Freeman's testimony. (*Id.* at 235:16–236:20). The parties did so. (*See* D.I. 994, 996, 997, 1004, 1005).

**1. Analysis of Dole Settlement Data**

Defendants contest Dr. Freeman's analysis of the Dole Settlement Data on six grounds: (1) Presenting evidence from Dole's settlement program would lead to undue prejudice against Dole (D.I. 801 at 9–10; D.I. 913 at 2–4), (2) the Dole Settlement Data is unreliable (D.I. 801 at 10; D.I. 913 at 2–4), (3) selection bias from the data set and Dr. Freeman's methodology render the analysis unreliable (D.I. 801 at 10–12; D.I. 913 at 4–6), (4) neither the data set nor Dr. Freeman account for confounders (D.I. 801 at 12–14), (5) Dr. Freeman's use of years of exposure as a proxy for actual exposure is flawed (D.I. 801 at 14; D.I. 913 at 6–8), and (6) Dr. Freeman should have used children fathered to measure fertility (D.I. 801 at 15–16; D.I. 913 at 6–8). I find none of these arguments availing. I thus deny the motion to exclude Dr. Freeman's opinions based on his analysis of the Dole Settlement Data.

Undue prejudice from using Dole Settlement Data. Defendants argue for exclusion of the Dole Settlement Data, as such data constitutes settlement negotiations, citing Rule 408, or is unduly prejudicial to Dole, citing Rule 403. (D.I. 801 at 9–10). I already ruled that "Rules 403 and 408 present trial issues" and "do not . . . implicate *Daubert* concerns."[17] (D.I. 956 at 6 n.5 (italicization added)). I do not address these arguments at this stage.

Reliability of Dole Settlement Data. Defendants argue that any analysis of the Dole Settlement Data is not reliable for epidemiological purposes, as the Dole settlement program was not designed to address scientific questions about DBCP exposure. (D.I. 801 at 10). I agree that

---

[17] Defendants argue that Dr. Freeman cannot use the Dole Settlement Data to offer opinions about what Dole knew in the 1990s. (D.I. 801 at 16). I held that I would exclude this kind of opinion as irrelevant. (D.I. 956 at 6 n.5).

the data was gathered for the purpose of administering a settlement program. I nonetheless find it difficult to believe that no meaningful analysis can be performed on the Dole Settlement Data simply because it is not designed for epidemiological study. Indeed, as Plaintiffs point out, epidemiologists can "analyze observational, non-study-designed data, including . . . compensation program files . . . , so long as limitations are identified and addressed." (D.I. 868 at 6–8 (citing D.I. 869-6 Ex. F, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 220, 221 nn.21, 23 (3d ed. 2011); D.I. 869-5 Ex. E, Eric I. Benchimol et al., *The REporting of studies Conducted using Observational Routinely-collected health Data (RECORD) Statement*, 12 PLOS MED. e1001885 (2015))). In other words, courts and epidemiologists recognize that helpful analysis can come from sources other than epidemiological studies. Thus, I find that the Dole Settlement Data is reliable for the epidemiological purposes for which Dr. Freeman uses it.

Selection bias. Defendants point out that, because participants self-selected into the program, the participants are "not representative of the entire population of workers," so the data inherently suffers from selection bias. (D.I. 801 at 10–11). They compare this case to *Gilbert v. Lands' End, Inc.*, where the court excluded Dr. Freeman's opinion because he relied on data from only exposed plaintiffs who reported symptoms to establish a general causal relationship between the exposure and symptoms. (D.I. 801 at 13 (citing 2022 WL 2643514, at *8–9 (W.D. Wis. July 8, 2022)). They say that Dr. Freeman exacerbates the selection bias by analyzing data from only the "subset of participants who had certain types of lab data available," as the workers "whose records did not have lab information differ substantially from the workers Dr. Freeman did analyze." (*Id.* at 10–11 (cleaned up)). Defendants contend that Dr. Freeman should have compared exposed workers "to a control group of unexposed workers" and that he should have analyzed the data by children fathered. (*Id.* (citing *Gilbert*, 2022 WL 2643514, at *9; *In re TMI*

*Litig.*, 193 F.3d 613, 708 (3d Cir. 1999))). They frame Dr. Freeman's decision to consider sperm counts instead of children fathered as cherry-picking data to find a certain dose response. (*Id.* at 12 (citing *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018))).

I am not persuaded. While an ideal epidemiological causation analysis would compare an exposed group to an unexposed control group, *see Gilbert*, 2022 WL 2643514, at *9, that does not mean that an epidemiological study must consider a control group to be reliable. In some instances, epidemiologists may compare lower-exposure subjects with higher-exposure subjects to understand the gradient effect of exposure.[18] (*See* D.I. 1004 at 1 (citing D.I. 1004-6 Ex. 6, 2 NAT'L RSCH. COUNCIL, ENVIRONMENTAL EPIDEMIOLOGY 31, 34–35 (1997)). This seems to be what Dr. Freeman does. He compares lower-exposure workers with higher-exposure workers and finds a relationship between higher DBCP exposure and lower sperm counts. Unlike in *Gilbert*, Dr. Freeman does not use his analysis to prove a general causal association between DBCP exposure and reduced sperm counts. Peer-reviewed literature establishes this causal relationship; Dr. Freeman's analysis focuses on better understanding and quantifying this relationship in an agricultural context. (D.I. 1027 at 20:23–21:17, 22:18–23). Defendants criticize Dr. Freeman for not following a gold standard, but admissibility simply asks whether Dr. Freeman's methodology is reliable. *See Oddi*, 234 F.3d at 145–46 ("The test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather, the test is

---

[18] For instance, if all participants are exposed, a study may instead compare groups with different levels of exposure. D.I. 1004 at 1 (citing D.I. 1004-6 Ex. 6, ENVIRONMENTAL EPIDEMIOLOGY 34–35). In other instances, "adding a truly unexposed group that differs on uncontrolled confounders can introduce bias, so restricting the analysis to the exposed gradient may yield the more valid estimate." (D.I. 1004 at 1 (citing D.I. 1004-3 Ex. 3, KENNETH J. ROTHMAN & SANDER GREENLAND, MODERN EPIDEMIOLOGY 316–17 (2d ed. 1998)).

whether the 'particular opinion is based on valid reasoning and reliable methodology.'" (citing *Kannenkeril*, 128 F.3d at 806)). I find that Dr. Freeman follows an accepted epidemiological methodology, one that does not require a no-exposure control group.

As I discuss below, I see no issue with Dr. Freeman's decision to analyze certain markers (sperm counts, hormone levels) rather than others (children fathered). His decision to exclude participants without lab results seems reasonable, given that he was analyzing the relationship between increased DBCP exposure and certain medical measurements. That Dr. Freeman, in excluding participants without results, excluded many participants who had children post-exposure does not appear to be a results-driven decision. In any event, Defendants' experts have opined on the Dole Settlement Data, and they will be able to present their interpretation at trial.

<u>Confounders.</u> Defendants argue that the Dole Settlement Data and Dr. Freeman's analysis fail to account for potential confounding factors that may have affected participants' lab results. (D.I. 801 at 12–13). Plaintiffs argue that Dr. Freeman's methodology (a regression analysis between two groups where the confounding variable is nearly constant) ensures that confounding factors do not materially affect the relationship he finds between DBCP exposure and sperm counts. (D.I. 868 at 7–8 (citing *Reference Manual on Scientific Evidence* 221 nn.21, 23)). Dr. Freeman controls for the confounding factor of age between his lower-exposure and higher-exposure groups. (*Id.*). While Defendants say there are many potential confounding factors (D.I. 1005 at 2), they do not identify a specific factor (*see* D.I. 1004 at 1), nor do they challenge Plaintiffs' position that Dr. Freeman's methodology mitigates the effects of any confounding variables (*see* D.I. 913 at 6–7). I do not find the failure-to-account-for-confounders argument persuasive.

<u>Years of exposure as a proxy for actual exposure.</u> Defendants provide two reasons that Dr. Freeman's exposure calculation is unreliable. First, he did not verify participants' self-reported years of exposure and, in some instances, credited erroneous years of exposure. (D.I. 801 at 14 (citing D.I. 802-1 Ex. E at 8–9; D.I. 802-1 Ex. F at 117:24–118:20)). Second, "years of exposure is a poor substitute for dose," as it does not account for "frequency or amount of exposure per year, or the means of exposure." (*Id.* (citing D.I. 802-1 Ex. B at 6; D.I. 802-1 Ex. C at 27)).

I reject both lines of reasoning. Courts regularly admit self-reported evidence, and inaccuracies may be addressed through cross-examination. (*See* D.I. 868 at 8–9 (citing *Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000); *In re Flint Water Cases*, 2023 WL 6279521, at *5 (E.D. Mich. Sept. 26, 2023); *Edgett v. Union Pac. R.R. Co.*, 2021 WL 1238498, at *9 (D. Neb. Apr. 1, 2021))). Potential factual errors in the Dole Settlement Data do not render the data set unreliable. That "is a matter affecting the weight and credibility of the testimony[—]a question to be resolved by the jury." *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435, 439 (D. Del. 2007) (quoting *Payton v. Abbott Labs*, 780 F.2d 147, 156 (1st Cir. 1985)).

Plaintiffs cite epidemiological literature stating that duration of exposure is a reasonable proxy for dose and explain why this literature applies to Dr. Freeman's analysis. (D.I. 1004 at 2 (citing D.I. 1004-8 Ex. 8, HARVEY CHECKOWAY ET AL., RESEARCH METHODS IN OCCUPATIONAL EPIDEMIOLOGY 19–21, 28 (2d ed. 2004) (explaining that duration of exposure is a common measure of exposure and can be a proxy for dose, especially as direct measurements of dose are often not available for an epidemiological investigation); D.I. 1004-11 Ex. 11, Harvey Checkoway & Carol H. Rice, *Time-Weighted Averages, Peaks, and Other Indices of Exposure in Occupational Epidemiology*, 21 AM. J. INDUS. MED. 25, 26 (1992) (explaining that cumulative exposure received during a defined time period can approximate dose); D.I. 1004-10 Ex. 10, Olav Axelson et al.,

*Assessing Dose-Response Relationships by Cumulative Exposures in Epidemiological Studies*, 50 AM. J. INDUS. MED. 217, 217 (2007) (explaining that an association of greater duration or intensity of exposure with greater occurrence of disease is evidence of a causal relationship))). Dr. Freeman does not account for participants' job types and differing levels of DBCP usage by year (D.I. 1005 at 1). Nonetheless, his duration-based analysis appears to be based on accepted epidemiological methodologies for extracting meaningful conclusions from imperfect data.

Measures of fertility. Defendants argue that Dr. Freeman's infertility analysis is unreliable because he focuses on "sperm concentrations and hormone levels alone" while "ignoring the ultimate measure of fertility—fathering children." (D.I. 801 at 15–16). Defendants' experts conduct their own analysis of fertility based on the number of children fathered by participants of the Dole settlement program (*id.*), and Plaintiffs do not challenge the admissibility of such testimony. I see no reliability issue with Dr. Freeman's analysis based on sperm counts rather than children fathered, as he only offers opinions on the former. (D.I. 1027 at 94:3–13; *see id.* at 38:11–39:10 (opining that "there is a reliable statistically significant relationship between increased duration of exposure and the increased risk of having no sperm or decreased sperm counts," and not opining on a relationship between low sperm count and infertility)). I reject Defendants' argument.

**2. Distilled Bradford-Hill methodology**

Plaintiffs contend that Dr. Freeman's distilled Bradford-Hill methodology is a faithful application of a reliable methodology (D.I. 868 at 16) and that he considers all nine Bradford-Hill viewpoints in his analyses (*id.* at 17–18 (citing D.I. 869-1 Ex. A at 29–30 (Dr. Freeman's report on Mr. Eugenio Villon); D.I. 869-4 Ex. D at 83:23–99:17 (Dr. Freeman's deposition on his methodology))). Plaintiffs' cited record evidence shows that Dr. Freeman applied his distilled

methodology to evaluate specific causation for individual plaintiffs. (*See* D.I. 869-1 Ex. A at 29–30; D.I. 869-4 Ex. D at 83:23–99:17). I already excluded Dr. Freeman's specific causation opinions. (D.I. 956 at 7–8). He does not use this methodology to assess general causation because "general causation was already established for exposure to DBCP as being a cause of male [in]fertility." (D.I. 1027 at 105:8–21). Thus, the Bradford-Hill methodology is irrelevant, and I therefore need not consider Dr. Freeman's distilled Bradford-Hill methodology any further.[19]

**D. Mr. Washburn**

Defendants' expert Stephen Washburn is an "environmental professional, with specific expertise in site assessment, chemical fate and transport, exposure assessment, and risk assessment." (D.I. 784-1 Ex. A at 1). Mr. Washburn offers eight primary opinions on the use of DBCP on relevant banana farms in Ecuador and Trial Group 1 plaintiffs' exposure to DBCP. (*Id.* at 2–5).

Plaintiffs move to exclude some of Mr. Washburn's opinions:[20] The Dole Applicators were not exposed to DBCP because corporate records show that DBCP was not available in Ecuador

---

[19] Of the seven publications Dr. Freeman provides in support of his distilled Bradford-Hill methodology, six cite his works only for general discussions of the field of medicolegal causation. Only one publication expressly approves of Dr. Freeman's abbreviated three-factor analysis. This article examines whether there is a causal relationship between cervical spine manipulation and stroke immediately afterward. *See* Steven P. Brown, *Plausible Mechanisms of Causation of Immediate Stroke by Cervical Spine Manipulation: A Narrative Review*, 16 CUREUS e56565 (2024). This article does not seem to be particularly strong support for Dr. Freeman's methodology in the field of toxic torts, where harmful effects may take years to manifest.

At least one district court has determined that a Bradford-Hill analysis is improper for proving specific causation. *See Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1274 (N.D. Ala. 2017), *aff'd in rel. part sub nom. Jones v. Novartis Pharms. Co.*, 720 F. App'x 1006 (11th Cir. 2018).

[20] Plaintiffs say that they seek "to exclude in its entirety [Mr. Washburn's] proposed testimony" (D.I. 784 at 1), but they later clarify that they do not seek to exclude his opinions "regarding the regulatory history of DBCP and EPA standard, opinions about volatilization of DBCP (separate from his speculative opinions on DBCP when mixed with unknown chemicals),

after 1980 (D.I. 784 at 6–8; D.I. 901 at 2–3); an exposure analysis cannot be undertaken (D.I. 784 at 8–9; D.I. 901 at 3–4); and other chemicals could have had an effect on the odor associated with DBCP (D.I. 784 at 9–10; D.I. 901 at 4). Defendants argue that Mr. Washburn's opinion of no DBCP exposure, based on his qualifications and factual evidence, is appropriate (D.I. 830 at 11–13); that he conducted an exposure analysis of all plaintiffs except Mr. Loja Alvarado, whose testimony was too vague for such an analysis (*id.* at 13–16); and that his opinions on other chemicals and their effects are supported by record evidence (*id.* at 16–17).

I denied Plaintiffs' motion on the latter two arguments. (D.I. 956 at 17). I said that the first opinion, that Mr. Eugenio Villon, Mr. Maza Vivanco, and Mr. Rosario Avelino "were not exposed to DBCP," based on Mr. Washburn's "review of various corporate records," did not seem to be scientific testimony. (*Id.*). I said that I would likely grant the motion as to these no-exposure opinions, "but I will give Defendants a chance to produce Mr. Washburn at the *Daubert* hearing if they think his testimony might persuade me otherwise." (*Id.* (italicization added)).

Mr. Washburn testified at a *Daubert* hearing on June 17, 2026. (Min. Entry June 17, 2026; *see* D.I. 1025). I asked him how he used his expertise to determine that DBCP was not available in Ecuador after 1980 (D.I. 1025 at 114:7–12) and what his expertise provided that could not be gleaned from corporate documents themselves (*id.* at 115:14–116:5, 117:4–12, 118:14–119:11). Mr. Washburn said that his expertise helps him understand what documents to look for and how to interpret them when conducting an exposure assessment.[21] (*Id.* at 114:13–115:13). I asked the

---

and opinions on the risk of contamination of water used for bathing and drinking" (*id.* at 5; *see* D.I. 830 at 10).

21 Mr. Washburn pointed to his knowledge of DBCP's use rates (D.I. 1025 at 116:5–20) and its regulatory history (*id.* at 117:14–118:6). It seems that Plaintiffs do not seek to exclude these opinions. (*See id.* at 118:7–13). I acknowledged Mr. Washburn's examples as information a jury likely would not know (*id.* at 116:21–117:3, 118:14–17) but reiterated that these examples do not

parties to submit letters on the admissibility of Mr. Washburn's opinions that Mr. Eugenio Villon, Mr. Maza Vivanco, and Mr. Rosario Avelino were not exposed to DBCP. (*Id.* at 122:1–123:21). The parties did so. (D.I. 999, 1000).

I exclude Mr. Washburn's no-exposure opinion, to the extent that this opinion depends on his review of Dole's corporate records. He does not explain how his expertise,[22] applied to Dole's 1979 shipping records, provides greater insight than what a reasonable juror could ascertain from reading the same documents on whether Dole stopped shipping DBCP to Ecuador by 1980. As I noted at the hearing, the shipping documents have dates and are intelligible to a jury without expert witness interpretation. (D.I. 1025 at 115:14–116:5, 117:4–12).

Moreover, I am concerned that Mr. Washburn's shipping cessation opinion is not supported by sufficient factual predicate. At the hearing, Mr. Washburn described the first step of his exposure assessment analysis, assessing the history of property and chemical use (D.I. 1025 at 67:21–70:25), and how he performed this first step here (*id.* at 73:13–76:1). But he did not seem familiar with record evidence that Ecuadorian farms may have had DBCP supplies from Dole shipments beyond 1980 (D.I. 1025 at 89:1–90:7; 101:23–104:13), which indicates that his assessment may not be based on a comprehensive view of the documents. At the very least, this appears to be a disputed factual matter. Allowing an expert witness to opine on when shipments stopped "would significantly increase the risk of misleading the jury and confusing the issues." *See Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000) (citing FED. R. EVID. 403).

---

explain how his expertise applies specifically to corporate shipping records (*id.* at 116:21, 117:4–12, 118:14–119:11).

[22] Mr. Washburn does not hold himself out as an expert in corporate conduct or contract interpretation. (D.I. 1025 at 75:8–76:1, 81:15–83:7).

Here, I worry that Mr. Washburn's expert testimony that three plaintiffs were not exposed to DBCP is, in effect, an "opinion on credibility." (D.I. 1025 at 119:4–11).

To be clear, I am excluding only a narrow portion of Mr. Washburn's opinions: that Dole ceased its use of DBCP in Ecuador by 1979 or 1980, and because of that cessation, that Mr. Eugenio Villon, Mr. Maza Vivanco, and Mr. Rosario Avelino were not exposed to DBCP. I am not excluding his testimony on DBCP use rates or its regulatory backdrop. Defendants may put forth the case that DBCP was not used in Ecuador after 1980 through documentary evidence and factual witness testimony, just as Plaintiffs may put forth the contrary case through their own record evidence and factual witnesses.

## IV. CONCLUSION

The motion to exclude the testimony of Dr. Frank (D.I. 768) is DENIED.

The motion to exclude the testimony of Dr. Dydek (D.I. 770) is GRANTED IN PART as to his opinion on Mr. Loja Alvarado's hours of DBCP exposure and otherwise DENIED IN PART. (*See* D.I. 956). The motion for reconsideration (D.I. 972) is DENIED.

The motion to exclude the testimony of Dr. Freeman (D.I. 800) is GRANTED IN PART as to his specific causation opinions and otherwise DENIED IN PART.

The motion to exclude the testimony of Mr. Washburn (D.I. 784) is GRANTED IN PART as to his opinion that Dole stopped shipping DBCP to Ecuador by 1980 and otherwise DENIED IN PART.

IT IS SO ORDERED.

Entered this 24th day of November, 2026

Richard G. Andrews
United States District Judge